Damon SMITH, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 49S02–0103–CR–170.

Supreme Court of Indiana.

March 27, 2001.

---

Michael J. Murphy, Legal Intern, Ann M. Skinner, Indianapolis, IN, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Priscilla J. Fossum, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

### ON PETITION FOR TRANSFER

BOEHM, Justice.

We grant transfer in this criminal appeal to decide whether retaining a defendant's DNA profile from a prior unrelated case and using it in a subsequent case violates the right to be secure from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Indiana Constitution. We also address whether retention of the DNA profile violated Indiana Code section 10–1–9–8. We affirm the trial court's denial of the defendant's motion to suppress this evidence.

### Factual and Procedural Background

On March 26, 1997, V.O. was attacked, raped, and robbed in her home. The attacker covered her head with a cloth and she did not see his face. Police created a DNA profile from samples collected from V.O., but were initially unable to identify a suspect.

In September 1997, Damon Smith was arrested and charged with rape in an unrelated case ("Case 1"). He was ordered by the trial court to provide hair, blood, and saliva samples. These were used by the Indianapolis–Marion County Forensic Services Agency ("Crime Lab") to create a DNA profile. On July 28, 1998, Smith was tried in Case 1. The DNA evidence identified Smith as the donor, but the jury acquitted Smith based on his defense that the intercourse was consensual.

In July 1998, according to the Crime Lab's routine procedures, Smith's profile from Case 1 was compared to those from unsolved cases and showed a tentative match to V.O.'s assailant. The Crime Lab notified investigators on V.O.'s case. According to the probable cause affidavit, further testing "concluded that the DNA results showed that Damon Lamont Smith . . . is . . . without a doubt the subject who raped V.O." Smith was charged with rape, robbery, and burglary.

Smith moved to suppress the DNA evidence on the grounds that its admission violated the Fourth Amendment, Article I, Section 11 of the Indiana Constitution, and Indiana Code section 10–1–9–8. The trial court denied Smith's motion and the order was certified for interlocutory appeal pursuant to Indiana Appellate Rule 4(B)(6). The Court of Appeals affirmed, *Smith v. State*, 734 N.E.2d 706 (Ind.Ct.App.2000), and we grant transfer.

## I. The Fourth Amendment

The sample in question was in the hands of the Crime Lab, but was derived from Smith pursuant to a court order in an unrelated case. The State contends that under these circumstances there was no "seizure" within the meaning of either the federal or state constitution and, in any event, Smith has no standing to raise the issue. Under Fourth Amendment law, the standing and search and seizure inquiries "merge into one: whether governmental officials violated any legitimate expectation of privacy held by petitioner." *Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct.

2556, 65 L.Ed.2d 633 (1980). Fourth Amendment rights are personal and may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). A legitimate expectation of privacy involves two components: "(1) did the person exhibit an actual expectation of privacy; and (2) does society recognize that expectation as reasonable?" *Moran v. State*, 644 N.E.2d 536, 540 (Ind. 1994) (citing *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)).

Smith had a legitimate expectation of privacy in his body and blood samples at the time they were taken in the investigation of Case 1. *See Schmerber v. California*, 384 U.S. 757, 770, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). We agree that this includes the DNA residing in the cells of these samples. However, he does not challenge the original court order that authorized the seizure of these items. There has been no seizure or invasion of Smith's privacy since the initial samples taken in Case 1. His claim thus reduces to the contention that the information must be destroyed after the investigation that analyzed it is concluded, or at least cannot be used in a subsequent investigation. We agree with several courts that have held that, once DNA is used to create a profile, the profile becomes the property of the Crime Lab. Thus, Smith had no possessory or ownership interest in it. Nor does society recognize an expectation of privacy in records made for public purposes from legitimately obtained samples. As the Court of Appeals pointed out, courts from other jurisdictions have held that the comparison of a DNA profile with other DNA evidence from a database does not violate the Fourth Amendment. *Bickley v. State*, 227 Ga.App. 413, 489 S.E.2d 167, 170 (1997); *Wilson v. State*, 132 Md.App. 510, 752 A.2d 1250, 1272 (2000); *People v. King*, 232 A.D.2d 111, 663 N.Y.S.2d 610, 614–15 (1997). We agree.

## II.   Article I, Section 11

Smith also challenges the "seizure" of DNA records under Article I, Section 11 of the Indiana Constitution.   Although this section and the Fourth Amendment are worded identically, as the Court of Appeals noted, the state constitutional standard has evolved differently from the Fourth Amendment analysis:

> To argue that a search or seizure is unreasonable, Smith "must establish ownership, control, possession, or interest in either the premises searched or the property seized." *Peterson v. State,* 674 N.E.2d 528, 534 (Ind.1996).   The property at issue in the instant case is a DNA profile record compiled by the Crime Lab. Smith has failed to show that he has any possessory interest or any other interest in the records kept by the Crime Lab. Inasmuch as Smith has no possessory interest in the profile record, Smith lacks standing to challenge the Crime Lab's use of its own record.

*Smith,* 734 N.E.2d at 710–11.

Furthermore, "the purpose of Article 1, Section 11 is to protect from unreasonable police activity, those areas of life that Hoosiers regard as private." *Moran v. State,* 644 N.E.2d 536, 540 (Ind.1994).  The police action in obtaining DNA samples from a rape suspect, and then comparing that profile to those created in other cases, was reasonable police conduct and not an unreasonable invasion of any private area of life.

The Court of Appeals, in addressing the Fourth Amendment claim, observed that:

> The closest analogue to retention of DNA samples is the fingerprint databank.  Our supreme court has held that police are not required to destroy an individual's fingerprint records after acquittal. *Mavity v. Tyndall,* 224 Ind. 364, 66 N.E.2d 755 (1946).  Balancing the public interest against the individual's right to privacy, the court observed that fingerprint records were "available and valuable only to the expert search-

ing for criminals." *Id.* at 760.   Our supreme court has also found that the State's interest in making records of arrested parties outweighed the right to privacy a defendant may have in his arrest records. *Voelker v. Tyndall,* 226 Ind. 43, 47–48, 75 N.E.2d 548, 551 (1947).   In *Kleiman v. State,* this court upheld the constitutionality of the statute limiting expungement of arrest records despite a defendant's acquittal. 590 N.E.2d 660, 662 (Ind.Ct.App.1992). *Smith,* 734 N.E.2d at 709 (footnote omitted).   We think this point is equally persuasive as to Article I, Section 11 of the Indiana Constitution.

As the Court of Appeals noted under the Indiana Constitution, this Court has "recognized that law enforcement agencies are permitted to retain and reuse fingerprint records as well as other records of arrested parties." *Smith,* 734 N.E.2d at 711 (citing *Voelker v. Tyndall,* 226 Ind. 43, 47–48, 75 N.E.2d 548, 551 (1947); *State ex rel. Mavity v. Tyndall,* 224 Ind. 364, 378, 66 N.E.2d 755, 760–61 (1946)).   We agree that this is equally true for DNA profiles.

■■   In sum, Smith has no standing to contest the comparison of his DNA profile to the evidence gathered from V.O.'s crime, and that comparison does not constitute a search or seizure under the Indiana Constitution.   Accordingly, Smith raises no issue under Article I, Section 11.

## III.   Indiana Code section 10–1–9–8

Finally, Smith claims that inclusion of his DNA profile in the Crime Lab database violated Indiana Code section 10–1–9–8.   In 1996, that section authorized the Superintendent of the State Police to create an Indiana DNA database consisting of "records for convicted criminals, crime scene specimens, unidentified missing persons, and close biological relatives of missing persons."   Ind.Code § 10–1–9–8(a) (1998).

Smith argues that Indiana Code section 10–1–9–8 authorizes retention of DNA

samples only in the four limited categories. Because he is not a convicted criminal, his DNA profile falls in none of the four. He contends that the statutory categories are exhaustive. As he puts it, the section is "restrictive legislation" that under *State ex rel. Mavity v. Tyndall*, 224 Ind. 364, 66 N.E.2d 755 (1946), requires DNA to be destroyed unlike fingerprints or arrest records.[1]

Section 10 of the same chapter provides that a person convicted of an offense against the person, burglary, or child solicitation is required to provide a DNA sample for the database. Section 20 provides that a person whose DNA has been included in the database may request its removal if the "conviction on which the authority for inclusion in the Indiana DNA database has been reversed."

It is clear that this statute was drafted with concern for widespread dissemination of the records. Section 22 refers to the "privacy standards" in the statute. Access to the database is limited to law enforcement agencies by section 21. Section 16 provides that unauthorized use of information in the database is a Class A misdemeanor. The statute provides for "expungement" of records on a showing of reversal of the conviction that "authorized" the inclusion of a profile. Ind.Code § 10–1–9–20 (1998). Use of the term "authorized" rather than "required" in describing the effect of a conviction suggests that the databank is to include only profiles of samples that fit within one of the four categories of (1) convicted criminals, (2) crime scene samples, (3) unidentified missing persons, or (4) close biological relatives of missing persons.

The statute also includes some provisions that apply to any "laboratory conducting forensic DNA analysis in Indiana." *Id.* § 10–1–9–14. Under section 14(c) they are required to "forward relevant DNA database records to the state police laboratory." Their disclosure of DNA analysis is restricted by section 17 to law enforcement, defense counsel, and certain other limited circumstances.

Smith contends that because he was acquitted in Case 1, the sample taken in that case falls into none of the four categories for which the database was created. From this, he reasons that the admission of his DNA profile would violate the database statute. We agree that he meets none of the criteria for inclusion in the database, but disagree that exclusion of the evidence of the DNA match is a consequence of that circumstance.

As a preliminary matter, it is not clear whether the database statute is relevant at all. The DNA profile in question was initially created by the Crime Lab, a Marion County Agency. Apparently the Crime Lab was also the agency that performed the initial analysis that "tentatively" identified Smith as a match to V.O.'s assailant. At this point we can only speculate as to the application of the statute. None of the provisions applicable to any laboratory in this state appear to be implicated by Smith's motion, and we cannot divine the relationship between the Crime Lab and the database, either in general or in relation to this case. It is not clear from the record in this case whether the Indiana DNA Database authorized by the statute played any role in the identification of Smith's profile, whether the Crime Lab acted independently of the database, or whether the nature of the Crime Lab is such that its records should be deemed part of the database authorized by the statute.

█ In any event, assuming the database is implicated, we agree with Smith that the statute seems to limit inclusion of profiles to the statutory categories. As noted, it refers to "expungement" of rec-

---

1. The *Mavity* Court stated, "[W]e can see no valid reason for the[ ] surrender or destruction [of fingerprint records] by the police. At least none so compelling as to justify our substituting a judicial discretion for the executive discretion permitted *by the absence of restrictive legislation.*" 224 Ind. at 378, 66 N.E.2d at 760 (emphasis added).

ords "authorized" to be included by reason of a conviction. The implication seems strong that without the conviction, the inclusion is not "authorized." And the inclusion of the statutory list of eligible profiles seems meaningless without construing it, as Smith urges, to limit the profiles that may be maintained in the database. Moreover, if profiles from arrest records—as opposed to profiles of convicted criminals—were to be maintained, as they are with respect to fingerprints, it would have been easy enough for the statute to say so. We conclude that the statute was hammered out to balance concerns for potential misuse of a mass of profiling of the citizenry against the obvious and very significant contribution to law enforcement that the database can make. Accordingly, Smith's motion raises the question whether the exclusionary rule applicable to searches and seizures that violate the state or federal constitution should apply to profiles that are included in the database from sources not authorized by the statute.

The rule excluding evidence seized in violation of the state constitution was adopted in Indiana in *Callender v. State*, 193 Ind. 91, 96, 138 N.E. 817, 818 (1922), long before *Mapp v. Ohio*, 367 U.S. 643, 655–57, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), held that the exclusionary rule was a requirement of the federal constitution in state proceedings as to evidence seized in violation of Fourth Amendment standards. The rule is entirely a creation of judicial precedent. Nothing in the state or federal constitution explicitly requires it. Similarly, there is no statutory direction as to the admissibility of DNA profiles included or retained in the database without statutory authorization. Unlike the two constitutions, however, the database statute does include a number of explicit prohibitions and sanctions. As already noted, some misuse of the information is subject to criminal penalties. The Superintendent is given explicit direction to promulgate rules for the implementation of the statute. Section 22 provides that a laboratory's failure to meet "quality and privacy standards described in this Chapter" may result in denial of the privilege of exchanging records with other criminal justice agencies. Because of this range of other sanctions, we are not faced with the total absence of incentive to comply with the law that led both state and federal courts to adopt the exclusionary rule as to constitutional violations. *Mapp*, 367 U.S. at 643, 81 S.Ct. 1684; *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Callender*, 193 Ind. at 91, 138 N.E. at 818.

Exclusion of extremely valuable evidence in crimes that often leave little other trace is a major social cost. In the absence of a clear directive from the legislature on the need to exclude this evidence and in view of the very substantial law enforcement benefits from the database, we conclude that the potential for abuse in the future is not sufficiently clear to warrant adopting a rule excluding evidence from the database on the ground that it was obtained or retained beyond the authorized classifications. The statute is relatively recent. An exclusionary rule would prioritize the need for compliance by the authorities with the statute over the cost of exclusion of obviously critical evidence as to a serious crime. If experience with the database statute suggests that denial of admissibility of DNA profiles obtained in violation of the statute is the only practical means of securing compliance with the "privacy standards described in [the database statute]" we can revisit this issue. The General Assembly is free to reconsider it at any time.

### Conclusion

The trial court's denial of the motion to suppress is affirmed.

SHEPARD, C.J., and DICKSON, SULLIVAN, and RUCKER, JJ., concur.