A09A1236. FORTUNE v. THE STATE.
(685 SE2d 466)

BARNES, Judge.

Five women were assaulted in a college dormitory apartment in December 2002. Based on a DNA profile extracted from a tube of lip balm left at the scene, Ruben Fortune was arrested and charged with two counts of aggravated sodomy, five counts of kidnapping, two counts of burglary, and two counts of aggravated assault. A jury

---

[54] Id.

convicted him on all counts in July 2004 and the trial court sentenced him to serve two consecutive life sentences plus sixty years. Fortune's motion for new trial was denied in October 2007, and this appeal was docketed in February 2009. Fortune argues on appeal that (1) the evidence was insufficient; (2) the trial court erred in denying his motion to suppress DNA evidence; and (3) the trial court erred in failing to charge the jury regarding the law of circumstantial evidence. Finding no error, we affirm.

1. We view the evidence on appeal in the light most favorable to the verdict, and no longer presume the defendant is innocent. We do not weigh the evidence or decide the witnesses' credibility, but only determine if the evidence is sufficient to sustain the convictions. *Campbell v. State*, 278 Ga. 839, 840 (1) (607 SE2d 565) (2005). We construe the evidence and all reasonable inferences from the evidence most strongly in favor of the jury's verdict. Id.

Viewed in that light, the evidence at trial established that on December 2, 2002, a man wielding a knife pushed his way into a Georgia State University dormitory apartment. He made the four residents and a resident's mother take off their clothes, then herded them into separate bedrooms and tied them to chairs with electrical cords he had cut off of the victims' appliances. During the two-hour ordeal, the man later identified as Fortune forced two of the women to sodomize him while he held a knife to their necks. The knife was a sharp kitchen knife, not as big as a butcher knife but sharper than a butter knife. Finally, another student came to the apartment door and Fortune directed one of the victims to tell the visitor to go away. The visitor stepped into the residence, glimpsed one of the distraught victims reflected in a bedroom mirror, and left to get help. Fortune then directed one of the victims to retrieve the visitor, but instead the victim ran to another apartment for help and locked herself in a bedroom. A resident from that apartment saw Fortune in the hall and tried to keep him there, but he escaped before police arrived.

Police officers found two bound women locked in one bedroom, a third woman in another bedroom, and a fourth victim in yet another room. The fifth victim, the one who had locked herself into the neighbor's bedroom, eventually came out when the police convinced her she was safe. The victims were all extremely upset, but several described their assailant as a short, thick, black man wearing a black do-rag, black pants, and brown shoes. They remembered that he spoke with a New York or Spanish accent and had a cross tattooed on his forearm.

A crime scene investigator photographed the apartment and collected evidence. He noticed a tube of Chapstick lip balm and a set of keys on a cloth lanyard lying on the hall floor, which stood out because nothing else was on the floor nearby. By then several victims

had returned from giving statements to the police and confirmed that the lip balm and keys did not belong to them, so the investigator secured those items. One victim recalled seeing the lanyard hanging from the assailant's coat pocket.

The investigator delivered the lip balm to a forensic serologist at the Georgia Bureau of Investigation (GBI) crime lab. The serologist, an expert in DNA analysis, swabbed the end of the balm, the inside of the lid, and the rim the lid sits on, placed the swabbing in a tube, and processed the material for DNA. She obtained a full profile of a male donor, compared it to DNA from Fortune's blood, and concluded that the DNA on the lip balm could only have come from Fortune. The serologist testified on cross-examination regarding the statistical information that led her to conclude the lip balm DNA came from Fortune, and on redirect she testified that information from a database initially led her to believe that the profile on the lip balm could be Fortune's.

When arrested, Fortune had in his pocket a kitchen knife, a tube of Chapstick lip balm, a black do-rag, and a set of keys on a blue and gold cloth lanyard identical to the one found at the crime scene. One of the keys on the ring found at the crime scene opened the door to Fortune's apartment. In an interview after his arrest, Fortune denied ever being in the apartment where the crimes took place and said at first he had been at home, then said he had been at work on the day of the assault. Fortune had a cross tattooed on one forearm and a scar on the other, which the victims recognized. All five of the victims independently picked Fortune from a photographic lineup and identified him at trial as the man who herded them from room to room, tied them to chairs, and assaulted two of them physically.

Fortune's testimony at trial differed from the statement he gave upon his arrest. He testified that his former roommate — Quint — called him on December 2, 2002, sounding distressed, and asked him to come to the dormitory apartment. He did not know Quint's last name. Fortune obtained a ride to the building, followed someone in through the secured access point, and knocked on the apartment door. Fortune said he thought he was going to the apartment to "chill" and have fun, but when Quint let him in he saw two crying women tied to chairs, and two naked women sitting on the bed in another room. At that point, he testified, "I just felt like I needed to get — I needed to get gone. I was just shook. [sic] I was like — I was nobody up there in my head." He said he "was threatened," so he promised the roommate he would not call the police and left the premises. Fortune did nothing to gain assistance for the victims because he was scared, he said. When he left, his roommate was already outside and asked for Fortune's keys, which Fortune gave him and then went to work.

Quint returned Fortune's keys, and moved out of the residence. Fortune no longer knew where Quint could be found. Fortune explained that he carried a kitchen knife because he feared the roommate was looking for him. He had lip balm in his pocket when arrested because he always carried it with him, and admitted that the lip balm at the scene was his. The keys found at the scene, however, belonged to his roommate, he said, and were on a lanyard and key ring similar to Fortune's.

Fortune admitted on cross-examination that he told the detective he had oral sex with one of the victims on the day of the crime, but asserted at trial that this part of his statement was not true. He explained that he did not tell the detective about his roommate also being there mostly because he feared the roommate would injure Fortune's family, but also because the detective would not take him back to jail but kept on pushing him for answers, so he "just started coming up with something." After his arrest he did not inform the detective or the prosecutor about his roommate because the detective "probably would have tried to give me a co-defendant instead of really trying to help me."

Fortune argues that the evidence — his DNA on the lip balm and the five victims' identification of him — only established his admitted presence at the scene. He further argues that the five victims only saw their assailant for at most a few minutes during the two-hour incident, and some of the victims' description of the assailant's clothing differed slightly. The evidence as outlined above was more than sufficient for a rational trier of fact to find Fortune guilty beyond a reasonable doubt of the offenses charged. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Fortune contends that the trial court erred in denying his motion to suppress the DNA evidence. He argues that the State violated OCGA § 24-4-60 et seq. by retaining his DNA profile generated from a blood sample collected pursuant to a 2000 search warrant in a rape case. Fortune was later acquitted of rape, successfully contending that the victim consented to have sex with him. He also argues that, because he was acquitted of the prior charge, he had no reason to suspect his DNA profile had been retained and thus no opportunity to expunge it as provided by OCGA § 24-4-65. Finally, he asserts that allowing the State to maintain his DNA evidence compelled him to give evidence against himself in violation of the state constitution and OCGA § 24-9-20.[1] Fortune does not argue on

---

[1] "No person who is charged in any criminal proceeding with the commission of any indictable offense or any offense punishable on summary conviction shall be compellable to give evidence for or against himself." OCGA § 24-9-20 (a).

appeal that the State violated his Fourth Amendment rights regarding his DNA profile. Therefore we will not address that issue, although in a different context we have found that the State's comparison of a defendant's lawfully obtained DNA profile with DNA evidence from other crimes did not violate the Fourth Amendment. *Bickley v. State*, 227 Ga. App. 413, 415 (489 SE2d 167) (1997).

(a) OCGA § 24-4-60 et seq. authorizes the creation of a database consisting of the DNA profiles of individuals convicted of various felony offenses. The Code further provides that upon request from a prosecutor or law enforcement agency, the GBI may compare a suspect's DNA profile to other "profiles lawfully collected and maintained by the bureau," but "shall not add a DNA profile of any such suspect to any DNA data bank except upon conviction as provided in this article." OCGA § 24-4-63 (b). The Code also allows the GBI to "create a separate statistical data base comprised of DNA profiles of samples of persons whose identity is unknown," which may be shared with other law enforcement agencies. OCGA § 24-4-63 (e).

> The results of an analysis and comparison of the identification of the characteristics from two or more biological samples shall be made available directly to federal, state, and local law enforcement officers upon a request made in furtherance of an official investigation of any criminal offense.

OCGA § 24-4-63 (a).

In this case, the DNA profile generated from Fortune's blood taken pursuant to the search warrant in the previous rape case was never entered into the database, known as CODIS.[2] The DNA profile entered into CODIS was generated from seminal fluid lawfully collected from the carpet stain at the scene of the incident that led to the rape charge against Fortune. The profile from the seminal fluid stain was labeled "unknown" and identified with a GBI case number. When the GBI serologist ran the lip balm DNA profile through CODIS, it matched the "unknown" carpet stain profile in the previous case. The serologist reviewed the GBI case file associated with the "unknown" profile, and noted that Fortune had been the defendant charged with rape in that case.

Based on the fact that the lip balm DNA profile matched the "unknown" carpet stain profile in CODIS, and Fortune was the suspect in the latter case, the State obtained a search warrant and

---

[2] CODIS, the Combined DNA Indexing System, is a database of DNA profiles linked among states through the Federal Bureau of Investigation.

obtained a blood sample from Fortune in May 2002. The serologist generated a new DNA profile from Fortune's blood, which matched the profile generated from material found on the lip balm.

Fortune argues that the owner of the carpet stain DNA profile in CODIS was not really "unknown" because it was labeled with a case number that led to him being identified as the suspect. He contends the State violated the statute regulating the DNA database because, although his profile did not qualify for entry into the database, it was nonetheless retained and subsequently transmitted in violation of state law. Basically, Fortune is arguing that the State should have undertaken on its own initiative to erase the link between the "unknown" forensic DNA profile from the carpet stain and the rape charge of which he was acquitted.

Fortune further argues that, because he was acquitted of the crime that led to the development of the profile, he did not know his DNA profile had been retained or entered into the database, and thus had no opportunity to expunge it pursuant to OCGA § 24-4-65. The statute provides that a person whose DNA profile was included in the database because of a felony conviction pursuant to OCGA § 24-4-60 may request its expungement if the conviction is reversed and case dismissed. First, the profile entered into CODIS was not from Fortune's blood but from seminal fluid found on the carpet at the scene of the first incident. Second, while Fortune argues he did not know that information related to him was included in the database, and therefore did not know he should have sought to expunge it, the statute puts the burden on the defendant to take action to expunge his information from the database under certain conditions, not on the State to do so automatically.

As the Indiana Supreme Court noted in considering a similar statute under similar circumstances, the DNA database statute was apparently drafted "to balance concerns for potential misuse of a mass of profiling of the citizenry against the obvious and very significant contribution to law enforcement that the database can make." *Smith v. Indiana*, 744 NE2d 437, 442 (3) (Ind. 2001). Pursuant to the Georgia statute, an individual's profile is entered into the database only upon conviction of certain crimes, and access to the database is limited to specific law enforcement agencies. It is clear from the record that Fortune met none of the criteria for inclusion in the database.

But the statute does not require the State to purge lawfully collected forensic profiles from its database, or to delete from those profiles information related to unsuccessful criminal prosecutions. While Fortune essentially argues that the State violated the spirit of the statute by including sufficient information with the "unknown" profile to identify it as belonging to him, absent legislative directive

regarding the admissibility of such evidence, we decline to adopt a rule excluding it on this ground. "Exclusion of extremely valuable evidence in crimes that often leave little other trace is a major social cost," and "the potential for abuse in the future is not sufficiently clear to warrant adopting a rule excluding evidence from the database on the ground that it was obtained or retained beyond the authorized classifications." *Smith*, supra, 744 NE2d at 440. Accordingly, the trial court did not err in denying Fortune's motion to suppress on the ground that the State violated the statute, OCGA § 24-4-60 et seq.

(b) Fortune also argues that requiring him to allow the State to maintain his DNA evidence from the prior case violates his statutory and state constitutional protections against self-incrimination, which provide that "[n]o person shall be compelled to give testimony tending in any manner to be self-incriminating." Ga. Const. Art. I, Sec. I, Par. XVI; OCGA § 24-9-20 (a). The Georgia constitutional protection against self-incrimination is broader than the federal protection, because while the United States constitutional protection applies only to "testimony," the Georgia Constitution applies to both oral and real evidence. *Creamer v. State*, 229 Ga. 511, 516 (192 SE2d 350) (1972). For example, it was error to force a defendant to place his foot into a print left near a burglary scene and use that evidence against him at trial. *Day v. State*, 63 Ga. 667 (1879). On the other hand, "[t]he removal of a substance from the body through a minor intrusion does not cause the person to be a witness against himself within the meaning of Fifth Amendment protection and similar provisions of Georgia law." *Strong v. State*, 231 Ga. 514, 519 (202 SE2d 428) (1973). Thus, the results of a blood test using blood taken from the defendant without his consent while he was unconscious were admissible. Id. "OCGA § 24-4-60 does not force a convicted felon to remove incriminating evidence but only to submit his or her body for the purpose of having the evidence removed." *Quarterman v. State*, 282 Ga. 383, 386 (4) (651 SE2d 32) (2007).

In this case, the State did not force Fortune to incriminate himself by maintaining in its database a DNA profile generated from a seminal fluid stain at the scene of an alleged rape, which included the GBI case number that led to Fortune being identified as the defendant in that case. Under these circumstances, the trial court did not err in denying Fortune's motion to suppress.

3. Finally, Fortune argues that the trial court erred in failing to charge the jury regarding the law of circumstantial evidence. The trial court defined direct and circumstantial evidence in its charge to the jury. On appeal Fortune argues that the trial court "failed to include any direction regarding the weight to be given to the

different types of evidence" and should have charged OCGA § 24-4-6, which provides: "To warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused."

First, Fortune did not submit a request to charge the contents of OCGA § 24-4-6, but only a request to charge the definitions of direct and circumstantial evidence. Second, the testimony of each victim is direct evidence of Fortune's guilt, and therefore, absent a request to charge the jury on OCGA § 24-4-6, the trial court committed no error in failing to do so sua sponte. *Yarn v. State*, 265 Ga. 787 (1) (462 SE2d 359) (1995).

*Judgment affirmed. Miller, C. J., and Andrews, P. J., concur.*

DECIDED OCTOBER 21, 2009.

*Carl P. Greenberg*, for appellant.
*Paul L. Howard, Jr., District Attorney, Marc A. Mallon, Assistant District Attorney*, for appellee.