The STATE of Ohio, Appellee,

v.

EMERSON, Appellant.

[Cite as *State v. Emerson*, 192 Ohio App.3d 446, 2011-Ohio-593.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 94413.

Decided Feb. 10, 2011.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Tiffany Hill and Brian M. McDonough, Assistant Prosecuting Attorneys, for appellee.

R. Brian Moriarty, L.L.C. and R. Brian Moriarty, for appellant.

FRANK D. CELEBREZZE JR., Presiding Judge.

{¶ 1} Appellant, Dajuan Emerson, challenges his convictions for aggravated murder and tampering with evidence. Raising five assignments of error, appellant argues that his DNA[1] profile was impermissibly included in a state DNA database, that his convictions are against the sufficiency and manifest weight of the evidence, that his statements made to the police during interrogation should have been suppressed, and that defense counsel was constitutionally deficient. After a thorough review of the record and law, we affirm.

{¶ 2} On July 4, 2007, the Cleveland police responded to the home of Marnie Macon on Elton Road in Cleveland, Ohio. Officers found Macon stabbed to death and naked from the waist down. The police began the task of collecting evidence,

---

1. Deoxyribonucleic acid.

including a knife, a beer can, and samples from a spot of blood found on a door knob inside the home. The police also noted a bottle of household cleaner lying on or near the victim and evidence that the knife, as well as the victim's body, had been cleaned in an apparent attempt to destroy evidence.

{¶ 3} The case remained unsolved until 2009, when a positive DNA profile match from the bloody doorknob to one contained in the state DNA database led the Cleveland police to appellant. When questioned about his familiarity with the Elton Road home, he denied ever having been there. However, once he learned of the DNA evidence, he said that he had been there on July 3 or 4, 2007, after he had met a woman at a bar and had paid her for sex, but he left her unharmed. Officers prepared a written statement for appellant to sign detailing this discussion, but appellant refused to sign.

{¶ 4} Appellant was indicted by a Cuyahoga County Grand Jury on charges of aggravated murder in violation of R.C. 2903.01, aggravated burglary in violation of R.C. 2911.11, and tampering with evidence in violation of R.C. 2921.12. He filed a motion to suppress his statements to the police and a supplementary motion seeking to suppress his DNA identification. On October 16, 2009, the trial court held a hearing on these motions. The evidence presented at the hearing demonstrated that as a result of a 2005 rape investigation, a sample of appellant's DNA was lawfully obtained and entered into the state DNA database as a known suspect. Appellant was tried and acquitted of those 2005 charges, but his DNA profile remained in the state database.

{¶ 5} Then, in 2009, a DNA profile was obtained from the blood left on the doorknob inside Macon's home. This profile of an unknown individual was entered into the state database and matched appellant's profile from the 2005 investigation. Appellant argues that the statutory scheme establishing the state database did not allow for the retention of records of acquitted individuals, and therefore the identification and everything flowing therefrom must be suppressed. The trial court determined that the state had the authority to maintain the records and denied appellant's motion to suppress the DNA identification and his statements to the police.

{¶ 6} A jury trial commenced on October 19, 2009, and resulted in appellant's being found guilty of aggravated murder and tampering with evidence. The trial court dismissed the charge of aggravated burglary pursuant to appellant's Crim.R. 29 motion. Appellant was sentenced to an aggregate prison term of 25 years to life on November 18, 2009.[2] Appellant now timely appeals, citing five assignments of error.

---

2. Appellant was sentenced to a term of incarceration of life with parole eligibility after 25 years for the unclassified aggravated-murder conviction and a concurrent term of incarceration of one year for tampering with evidence.

## Law and Analysis

{¶ 7} Appellant first argues, "The trial court erred and/or abused its discretion when it denied [his] motion to suppress." Within this assigned error are two issues: the first deals with the retention of appellant's DNA profile in the state database following his acquittal in 2005; the second deals with the voluntary waiver of his Miranda rights when giving a statement to the Cleveland police.

## The Retention of DNA Records

{¶ 8} Appellant raises an issue not previously addressed by appellate courts in Ohio. Arguing that R.C. 2901.07 and 109.573 do not authorize the continued retention of the DNA profile of one acquitted of a crime, appellant asserts that his identification should have been suppressed.

{¶ 9} "In a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate witness credibility. A reviewing court is bound to accept those findings of fact if supported by competent, credible evidence. However, without deference to the trial court's conclusion, it must be determined independently whether, as a matter of law, the facts meet the appropriate legal standard." (Citations omitted.) *State v. Curry* (1994), 95 Ohio App.3d 93, 96, 641 N.E.2d 1172.

{¶ 10} The Combined DNA Index System ("CODIS") "is a computerized program designed to house DNA profiles from convicted offenders, forensic samples, suspects, missing persons, unidentified remains and relatives of missing persons in various searchable databases." Baringer, CODIS Methods Manual (5th Rev.2009) 3. These profiles are generated using DNA samples that are processed to create a DNA profile unique to the individual.[3] CODIS has three levels—local, state, and national, with the Cuyahoga County Coroner's Office controlling the local database, the Ohio Bureau of Criminal Identification and Investigation ("BCI") controlling the state database, and the Federal Bureau of Investigation maintaining the federal database. Id. Former R.C. 2901.07, as it existed prior to its amendment in 2010, authorized the creation and maintenance of a DNA profile database populated with DNA profiles from convicted persons. 151 Ohio Laws, Part II, 2868, 3308–3312. Current R.C. 2901.07 adds authority to collect and store the profiles of those arrested on felony charges as well as those convicted of a felony. R.C. 2901.07(B)(1). R.C. 109.573 is a similar statute dealing with records from "forensic casework or from crime scenes, specimens from anonymous and unidentified sources[,]" and missing persons and their relatives. All 50 states have such legislation. *State v. Gaines*, Cuyahoga App. No. 91179, 2009-Ohio-622, 2009 WL 344990, ¶ 58.

---

**3.** Except, possibly, in the case of identical twins.

{¶ 11} A DNA profile is a record separate and distinct from the DNA sample from which it is created. Therefore, we must address the state's contention that appellant lacks standing to challenge the search. More specifically, the state alleges that appellant has no ownership interest in the DNA profile created from his validly collected DNA sample. "Under Fourth Amendment law, the standing and search and seizure inquiries 'merge into one: whether governmental officials violated any legitimate expectation of privacy held by petitioner.' *Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). Fourth Amendment rights are personal and may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)." *Smith v. State* (Ind.2001), 744 N.E.2d 437, 439.

{¶ 12} In *Smith*, a defendant challenged a DNA search and match involving Indiana's DNA database using a DNA profile that remained in the state database after acquittal of the crimes for which the sample was taken. The Indiana Supreme Court ruled that the trial court properly denied a motion to suppress based on the Fourth Amendment because the sample was lawfully obtained during the first investigation. That court held, "[O]nce DNA is used to create a profile, the profile becomes the property of the Crime Lab. Thus, [a defendant] had no possessory or ownership interest in it. Nor does society recognize an expectation of privacy in records made for public purposes from legitimately obtained samples." Id. at 439. See also *State v. Barkley* (2001), 144 N.C.App. 514, 519, 551 S.E.2d 131 ("It is also clear that once a person's blood sample has been obtained lawfully, he can no longer assert either privacy claims or unreasonable search and seizure arguments with respect to the use of that sample. Privacy concerns are no longer relevant once the sample has already lawfully been removed from the body, and the scientific analysis of a sample does not involve any further search and seizure of a defendant's person").

{¶ 13} Analogizing the taking of a DNA sample with the taking of fingerprints, this court has previously noted that a convicted individual's privacy interest in these identifying records is particularly weak. *Gaines*, 2009-Ohio-622, 2009 WL 344990, at ¶ 58, citing *In re Nicholson* (1999), 132 Ohio App.3d 303, 724 N.E.2d 1217, and *Davis v. Mississippi* (1969), 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676.

{¶ 14} The state also sees similarity in a Georgia appellate case, *Fortune v. State* (2009), 300 Ga.App. 550, 685 S.E.2d 466, and argues that its analysis and holding should apply here. In *Fortune*, a DNA sample was collected from seminal fluid found on carpeting at a crime scene, and a DNA profile was prepared and entered into Georgia's state database. This DNA profile of an unknown individual was entered into the federal CODIS database and labeled with a Georgia criminal case number related to the crime. This criminal case

number and related information showed that Fortune was the main suspect and was tried and acquitted in that case. Later, a DNA profile obtained from lip balm found at a crime scene involving a separate criminal investigation was matched to the unknown DNA profile generated from the sample collected from the carpet stain. Id. at 554. However, because this profile contained a criminal case number that identified Fortune, he argued that it was not of an "unknown" individual and should have been purged from the database after his acquittal. The Georgia appellate court noted that the defendant could have requested expungement of the criminal records from the first case pursuant to Georgia's expungement statute. The expungement statute is similar to Ohio's statutory scheme.

{¶ 15} Like Georgia's DNA collection statutes, Ohio's scheme does not specify what should happen to validly obtained samples maintained in the database after acquittal. Citing *Smith*, 744 N.E.2d 437, *Fortune* declined to adopt an exclusionary rule in the case, noting, " 'Exclusion of extremely valuable evidence in crimes that often leave little other trace is a major social cost,' and 'the potential for abuse in the future is not sufficiently clear to warrant adopting a rule excluding evidence from the database on the ground that it was obtained or retained beyond the authorized classifications.' " Id. at 556, quoting *Smith* at 440.

{¶ 16} Citing Section 17.60 of the CODIS Manual, appellant claims that the record should have been removed. However, this section dealing with expungement does not require removal of records after acquittal. Had appellant desired records of this earlier, unsuccessful prosecution to be expunged, he could have requested expungement, and then any DNA profile would have been removed pursuant to this section. Although not clear, Ohio appears to place the onus of removal from the state database on those acquitted of a crime. At the very least, the exclusionary rule should not be applied to this case, where the DNA profile was validly obtained from the first case, appellant had no possessory or privacy interest in the profile, and the federal CODIS regulations offer a significant deterrent in the form of exclusion from the federal database. See *Smith*, 744 N.E.2d at 440.

{¶ 17} Here, because appellant has no possessory interest in his DNA profile generated from a lawfully obtained DNA sample, he lacks standing to challenge the later CODIS records search as a violation of his Fourth Amendment rights. This view is also shared by Maryland. See *Williamson v. State* (2010), 413 Md. 521, 993 A.2d 626.

{¶ 18} Appellant also argues that the search warrant issued to obtain a sample of appellant's DNA used to confirm the match already obtained from the

CODIS system was defective and should also result in the exclusion of the evidence.

{¶ 19} Detective Joseph Chojnowski testified at the suppression hearing that he had received a report of a DNA profile match from the Cuyahoga County Coroner's office. He then applied for and received a search warrant to obtain a DNA sample from appellant via buccal swab. Appellant argued that this warrant was defective because the attached affidavit described CODIS as a "database that stores sample DNA from convicted felons in the State of Ohio." In reality, CODIS stores DNA profiles from several classes of individuals, including convicted felons.

{¶ 20} "An affidavit supporting a search warrant enjoys a presumption of validity. To successfully attack the veracity of a facially sufficient affidavit, a defendant must show by a preponderance of the evidence that the affiant made a false statement either 'intentionally or with a reckless disregard for the truth.' 'Reckless disregard' means that the affiant had serious doubts about an allegation's truth. Further, even if the affidavit contains false statements made intentionally or recklessly, a warrant based on the affidavit is still valid unless, 'with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause * * *.' " (Ellipsis sic.) *State v. Taylor*, 174 Ohio App.3d 477, 2007-Ohio-7066, 882 N.E.2d 945, ¶ 21.

{¶ 21} Here, if the statement is removed, the warrant still establishes probable cause to compel a DNA sample to confirm the match obtained from a search of the CODIS system. This warrant was not invalid.

{¶ 22} The trial court ruled that the state had authority to collect and retain appellant's DNA profile under R.C. 109.573. The court also indicated that the sample obtained by Chojnowski was taken in good faith. While the language used in R.C. 109.573, which allows for collection and storage of DNA profiles from "forensic casework," may be so broad as to encompass the facts before us, appellant lacks standing to challenge the search as violative of his Fourth Amendment right, and the exclusionary rule should not be applied to this case even if the DNA database search were beyond the scope of the statute.

## Miranda Violation

{¶ 23} Appellant also argued in his suppression motions that his statements made to the Cleveland police during an interview should be suppressed, and the trial court erred in not so holding. "Pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694, statements 'stemming from custodial interrogation of the defendant' must be suppressed unless the defendant had been informed of his Fifth and Sixth Amendment rights before being questioned. 'Custodial interrogation' means 'questioning initiated

by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' Id." *State v. Preztak,* 181 Ohio App.3d 106, 2009-Ohio-621, 907 N.E.2d 1254, ¶ 23. " 'The State bears the burden of establishing, by a preponderance of the evidence, that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights based on the totality of the circumstances surrounding the investigation. *State v. Gumm* (1995), 73 Ohio St.3d 413, 429, 653 N.E.2d 253.' " Id. at ¶ 26, quoting *State v. Williams,* Cuyahoga App. No. 82094, 2003-Ohio-4811, 2003 WL 22100230, ¶ 12.

{¶ 24} With regard to the suppression of appellant's oral statements made to the police officers, Chojnowski testified that he and another officer interviewed appellant without recording the interview. However, Chojnowski did type the statements appellant made. During the interview, appellant requested counsel, and the interview ceased. Appellant refused to sign the typed statement. The first thing evidenced in the statement was that appellant had been read his *Miranda* rights and had voluntarily waived them. Chojnowski testified that appellant was read his *Miranda* rights and voluntarily waived them. He also testified that the standard *Miranda* warnings were posted in large font on the wall appellant was facing for the entire duration of the interview. From the entirety of the evidence offered on this issue,[4] we conclude that the trial court did not err in finding that appellant had validly waived his *Miranda* rights and voluntarily gave the Cleveland police an oral statement.

### Sufficiency and Manifest Weight

{¶ 25} In his second and third assignments of error, appellant argues that "[t]he guilty verdict is based upon insufficient evidence" and "[t]he guilty verdicts are against the manifest weight of the evidence."

{¶ 26} Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. A conviction based on legally insufficient evidence constitutes a denial of due process. *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 72 L.Ed.2d 652, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 27} When there is substantial evidence upon which the trier of fact has based its verdict, a reviewing court abuses its discretion in substituting its

---

4. Appellant never claimed in his written suppression motion or at the suppression hearing that he was not read his *Miranda* rights, but that he did not knowingly and voluntarily waive them. The fact that appellant invoked his right to counsel indicates that appellant was made aware of these rights at the time of interrogation.

judgment for that of the trier of fact as to the weight and sufficiency of the evidence. *State v. Nicely* (1988), 39 Ohio St.3d 147, 156, 529 N.E.2d 1236.

{¶ 28} The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 227 N.E.2d 212. On review, the appellate court must determine, after viewing the evidence in a light most favorable to the prosecution, whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492; *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶ 29} Sufficiency of the evidence is subjected to a standard different from manifest weight of the evidence. Section 3(B)(3), Article IV of the Ohio Constitution authorizes appellate courts to assess the weight of the evidence independently of the fact-finder. Thus, when a claim is assigned concerning the manifest weight of the evidence, an appellate court "has the authority and duty to weigh the evidence and to determine whether the findings of * * * the trier of the facts were so against the weight of the evidence as to require a reversal and a remanding of the case for retrial." *State ex rel. Squire v. Cleveland* (1948), 150 Ohio St. 303, 345, 38 O.O. 161, 82 N.E.2d 709.

{¶ 30} The United States Supreme Court recognized the distinction in considering a claim based upon the manifest weight of the evidence as opposed to sufficiency of that evidence. The court held in *Tibbs*, 457 U.S. at 43, 102 S.Ct. 2211, 72 L.Ed.2d 652, that unlike a reversal based upon the insufficiency of the evidence, an appellate court's disagreement with the jurors' weighing of the evidence does not require special deference accorded verdicts of acquittal, i.e., invocation of the Double Jeopardy Clause as a bar to relitigation. Upon application of the standards enunciated in *Tibbs, State v. Martin* (1983), 20 Ohio App.3d 172, 20 OBR 215, 485 N.E.2d 717, has set forth the proper test for addressing the issue of manifest weight of the evidence. *Martin* stated:

{¶ 31} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. at 175.

{¶ 32} Aggravated murder, as it relates to this case, prohibits purposely, and with prior calculation and design, causing the death of another. R.C. 2903.01(A). Appellant argues there was no evidence that he acted with prior calculation and design. "The section employs the phrase, 'prior calculation and

design,' to indicate studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must amount to more than momentary deliberation." See *State v. Keenan* (1998), 81 Ohio St.3d 133, 157, 689 N.E.2d 929. "Prior calculation and design requires something more than instantaneous deliberation. However, prior calculation and design can be found even when the killer quickly conceived and executed the plan to kill 'within a few minutes.' It is not required that a prolonged thought process be present. There is no bright line test to determine whether prior calculation and design are present, rather each case must be decided on a case-by-case basis." (Footnotes omitted.) *State v. Torres*, Cuyahoga App. No. 86530, 2006-Ohio-3696, 2006 WL 2023578, ¶ 46.

■ {¶ 33} "Some of the important factors to be examined and considered in deciding whether a homicide was committed with prior calculation and design include: whether the accused knew the victim prior to the crime, as opposed to a random meeting, and if the victim was known to him whether the relationship had been strained; whether thought and preparation were given by the accused to the weapon he used to kill and/or the site on which the homicide was to be committed as compared to no such thought or preparation; and *whether the act was drawn out over a period of time as against an almost instantaneous eruption of events*. These factors must be considered and weighed together and viewed under the totality of all circumstances of the homicide." (Emphasis added.) *State v. Jenkins* (1976), 48 Ohio App.2d 99, 102, 2 O.O.3d 73, 355 N.E.2d 825, citing *State v. Channer* (1926), 115 Ohio St. 350, 154 N.E. 728; *State v. Manago* (1974), 38 Ohio St.2d 223, 67 O.O.2d 291, 313 N.E.2d 10.

{¶ 34} In *Torres*, we held that a "jury could find prior calculation and design, necessary for an aggravated murder conviction, based on the protracted nature of the murders." Id. at ¶ 47. In that case, two people were discovered stabbed and bludgeoned to death in the basement of a home. One body had 37 stab wounds and blunt-force trauma to the head, and the other had 20 stab wounds and blunt-force trauma. In the present case, the victim was stabbed 74 times, including several defensive wounds.

{¶ 35} In *State v. Jones*, Cuyahoga App. No. 88134, 2007-Ohio-1301, 2007 WL 853215, ¶ 38, this court found sufficient evidence of prior calculation and design, noting that the victim "suffered over twenty-five blows. Further, it is clear from the gruesome crime scene that [the victim's] beating occurred throughout the entire house. The massive amount of blood in several rooms of the house indicate that [the victim's] murder was not a single, isolated event, but rather an elongated, deliberate attack. Jones used several different weapons throughout his attack on [the victim] and carried the attack through several different rooms

of the house. It is also apparent that the attack took place over time and was not instantaneous, since Jones took the time to drag [the victim] through several rooms of the home, strip off the majority of his clothing, urinate on him, and then dump the contents of a mop bucket on him." (Citations omitted.)

{¶ 36} Similar events took place in this case. The attack was protracted, occurring in several rooms of the victim's home. Also significant was the testimony of the coroner, Dr. Daniel Galita, indicating that the victim survived for as long as an hour after the stab wounds were inflicted, but was unable to move because her spinal cord had been damaged. While the victim lay bleeding to death, appellant was cleaning her body and the murder weapon. Sufficient evidence exists in the record to allow a jury to determine that appellant acted with prior calculation and design.

{¶ 37} Appellant also argues that there was no evidence that he tampered with evidence. R.C. 2921.12(A)(1) criminalizes the alteration, destruction, concealment, or removal of anything "with purpose to impair its value or availability as evidence in [a] proceeding" by one "knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted." Here, there is significant evidence that appellant attempted to sanitize the crime scene in an effort to hinder investigation. An empty bottle of cleaning solution was found next to the victim's body. The coroner's report and testimony also noted that the victim's body had been cleaned with a household cleaning product. The knife collected at the scene, believed to be the murder weapon, also had been cleaned. This demonstrates that sufficient evidence existed to convict appellant of tampering with evidence.

{¶ 38} Appellant's convictions are also not against the manifest weight of the evidence. Appellant's blood, along with the blood of the victim, was found on the knife believed to be the murder weapon. Appellant's DNA was also found on a beverage can, and his blood was on an interior doorknob in the victim's home. Appellant admitted being at the victim's home around the time of her killing after first denying ever having visiting her there. While several other DNA samples collected from the crime scene were not matches to appellant, the sample collected from the knife was a match. Appellant has failed to convince this court that a manifest miscarriage of justice has occurred in this case. Therefore, this assignment of error is overruled.

### Jury Instructions

{¶ 39} Appellant also claims, "The trial court abused its discretion in failing to give jury instructions for a lesser included offense."

{¶ 40} "When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction or giving an instruction constituted an abuse of discretion under the facts and circumstances of the case. See *State v. Wolons* (1989), 44 Ohio St.3d 64, 68, 541 N.E.2d 443. In addition, jury instructions are reviewed in their entirety to determine if they contain prejudicial error. *State v. Porter* (1968), 14 Ohio St.2d 10 [43 O.O.2d 5], 235 N.E.2d 520." *State v. Williams,* Cuyahoga App. No. 90845, 2009-Ohio-2026, 2009 WL 1156678, ¶ 50.

{¶ 41} Here, appellant agreed to the jury instructions as proposed by the trial court and never requested a lesser-included-offense instruction. Appellant has waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Plain error "should be applied with utmost caution and should be invoked only to prevent a clear miscarriage of justice." Id. at 14. Plain error exists only when it is clear that the verdict would have been otherwise but for the error. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

{¶ 42} We find no error in the jury charge here. A trial court must charge the jury on a lesser included offense "only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 216, 533 N.E.2d 286. Here, there is no evidence that would support an acquittal. Therefore, the trial court did not err in not sua sponte giving an instruction on a lesser included offense. This assignment of error is overruled.

### Ineffective Assistance of Counsel

{¶ 43} Finally, appellant argues that he was "denied effective assistance of counsel." In order to substantiate a claim of ineffective assistance of counsel, the appellant is required to demonstrate that (1) the performance of defense counsel was seriously flawed and deficient and (2) the result of appellant's trial or legal proceeding would have been different had defense counsel provided proper representation. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Brooks* (1986), 25 Ohio St.3d 144, 25 OBR 190, 495 N.E.2d 407.

{¶ 44} In reviewing a claim of ineffective assistance of counsel, it *must* be presumed that a properly licensed attorney executes his legal duty in an ethical and competent manner. *State v. Smith* (1985), 17 Ohio St.3d 98, 17 OBR 219, 477 N.E.2d 1128; *Vaughn v. Maxwell* (1965), 2 Ohio St.2d 299, 31 O.O.2d 567, 209 N.E.2d 164.

{¶ 45} The Ohio Supreme Court held in *State v. Bradley* (1989), 42 Ohio St.3d 136, 141–142, 538 N.E.2d 373: " 'When considering an allegation of ineffective assistance of counsel, a two-step process is usually employed. First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness.' *State v. Lytle* (1976), 48 Ohio St.2d 391, 396–397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627, vacated in part on other grounds (1978), 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154. This standard is essentially the same as the one enunciated by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674."

{¶ 46} "Even assuming that counsel's performance was ineffective, this is not sufficient to warrant reversal of a conviction. 'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. Cf. *United States v. Morrison,* 449 U.S. 361, 364–365 [101 S.Ct. 665, 66 L.Ed.2d 564] (1981).' *Strickland,* supra, 466 U.S. at 691, 104 S.Ct. at 2066 [80 L.Ed.2d 674]. To warrant reversal, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Strickland,* supra, at 694, 104 S.Ct. at 2068 [80 L.Ed.2d 674]. In adopting this standard, it is important to note that the court specifically rejected lesser standards for demonstrating prejudice." *Bradley* at 142.

{¶ 47} "Accordingly, to show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id. at 143.

{¶ 48} Here, appellant argues that trial counsel was deficient for failing to file a motion to investigate and invalidate the warrant used to compel appellant to submit a DNA sample based on the language in its attached affidavit that described the CODIS database as a "database that stores sample DNA from convicted felons in the State of Ohio." Appellant has not shown that a challenge of the inclusion of this statement in the warrant would have changed the outcome of the matter. Appellant argues that he was not a convicted felon, and the warrant would not have been issued without this mistaken reference. The challenged line does not state that appellant was a convicted felon or that his DNA profile was stored in the database as a result of his being a convicted felon.

The challenged averment merely inaccurately describes the CODIS database by leaving out all the other classes of profiles that are stored therein. Removing this sentence would likely have had no impact on the issuance of the warrant. Therefore, appellant has failed to demonstrate that a *Franks* [5] hearing to challenge the validity of the warrant would have been successful, especially given the ruling of the trial court that the state had the authority to maintain appellant's DNA profile under R.C. 109.573.

{¶ 49} Having overruled all of appellant's assigned errors, we affirm his convictions.

Judgment affirmed.

SWEENEY and GALLAGHER, JJ., concur.

---

5. See *Franks v. Delaware* (1978), 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667.