[Cite as *State v. Goins*, 2015-Ohio-3121.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 14AP-747 |
| | | (C.P.C. No. 13CR-4499) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Antiwonne M. Goins, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on August 4, 2015

*Ron O'Brien*, Prosecuting Attorney, and *Laura R. Swisher*, for appellee.

*Yeura R. Venters*, Public Defender, and *David L. Strait*, for appellant.

APPEAL from the Franklin County Court of Common Pleas.

BROWN, P.J.

{¶ 1} Defendant-appellant, Antiwonne M. Goins, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of rape, gross sexual imposition, felonious assault, aggravated burglary, kidnapping and associated repeat violent offender ("RVO") specifications.

{¶ 2} In the early morning hours of May 31, 2013, C.G. walked home to her second-story apartment after working at a nearby bar. She went straight to bed without showering or changing out of her clothing. Soon after she went to bed, she awoke to discover a strange man, later identified as appellant, standing in her bedroom. Thinking appellant had somehow mistakenly entered her apartment, C.G. asked him to leave.

Appellant refused, climbed onto the bed, held C.G. down with his body, and choked her into momentary unconsciousness.  After C.G. awoke, appellant removed her clothing and admonished her not to struggle against him.  When C.G. resisted, appellant choked her again.  He then performed oral sex on her and licked her right nipple.

{¶ 3}  Believing she could escape if she exited the bedroom, C.G. told appellant she needed a drink of water because he had choked her so hard.  Appellant held C.G.'s hands behind her while leading her into the kitchen.  As C.G. drank a glass of water, appellant pulled down his pants and put C.G.'s hand on his penis.  C.G. then threw the glass and ran out of her apartment.  When she reached the top of the stairway outside her apartment, appellant pushed her down the stairs.  He then choked C.G. until she briefly lost consciousness.  When she regained consciousness, she ran to a neighbor's apartment and reported she had been raped.  In the meantime, appellant fled the scene.

{¶ 4}  C.G.'s neighbor called 911.  Shortly thereafter, police and emergency medical personnel arrived.  C.G. was transported to a local hospital where she submitted to a sexual assault examination.  That examination, commonly referred to as a "rape kit," included the collection of DNA specimens from C.G.'s neck, right breast, and vaginal area.  Detective Michael Cameron interviewed C.G., obtained the rape kit from the hospital, and submitted it to the Ohio Bureau of Criminal Investigation ("BCI") for DNA analysis.

{¶ 5}  Detective Cameron thereafter began an investigation which included issuance of a press release containing a general description of the assailant.  The press release generated an anonymous tip about a potential suspect, which was not appellant.  Detective Cameron obtained a photograph of the potential suspect and included it in a photo array that was presented to C.G. on June 1, 2013.  The photo array did not include appellant's photo.  C.G. identified a person other than the potential suspect as her assailant.  Further investigation of this individual provided no additional information tying him to the sexual assault.

{¶ 6}  Devonie Herdeman, a forensic scientist in BCI's DNA unit, performed a DNA analysis on the evidence collected from C.G.'s rape kit, generated DNA profiles from that evidence, and entered the non-victim DNA profiles into BCI's Combined DNA Index

System ("CODIS").[1]  Hannah Cox, a forensic scientist in BCI's CODIS unit, compared the DNA profiles recovered from C.G.'s rape kit to DNA profiles that already existed in CODIS.  Based on this comparison, appellant was identified as a possible suspect.  BCI notified Detective Cameron of this "possible investigative lead" in a June 7, 2013 "State Hit Notification."  More specifically, the notification indicated that "a preliminary association" was made between "specimen G74 13-14458-1.12CPD" and appellant.  The notification advised Detective Cameron to obtain an additional DNA sample from appellant for verification by BCI's forensic laboratory.

{¶ 7}  Based on the BCI notification, Detective Cameron prepared a photo array that included appellant's photo.  On June 8, 2013, C.G. was shown the photo array; she identified her assailant as an individual other than appellant.

{¶ 8}  That same day, June 8, 2013, Detective Cameron obtained a warrant for appellant's arrest. Aware of the arrest warrant against him, appellant voluntarily surrendered to police on August 16, 2013.

{¶ 9}  Thereafter, Sergeant David Pelphrey assumed investigation of the case.  He reviewed the information contained in Detective Cameron's investigative file, including the June 7, 2013 notification from BCI.  On August 21, 2013, Sergeant Pelphrey requested a search warrant to obtain appellant's DNA for comparison testing.  The affidavit submitted in support of the search warrant states:

> On May 31, 2013 at approximately 6:45am [sic], an unknown suspect forcibly entered the victim's home in the area of S. Champion Ave and Franklin Ave.  The victim was asleep.  The suspect entered the victim's bedroom. When the female victim awoke the suspect was standing at the foot of her bed.  The suspect jumped on top of the victim and began to choke her with his hands as she screamed and began to fight.  During the struggle, the defendant grabbed the victim by the chin and crown of her head and twisted violently causing the victim to believe that he was going to kill her.  The defendant told the victim to stop struggling with him and she did so fearing for her life.  The defendant removed her clothing and violated her by means of licking and sucking on her breasts.  The male also

---

[1] CODIS " 'is a computerized program designed to house DNA profiles from convicted offenders, forensic samples, suspects, missing persons, unidentified remains and relatives of missing persons in various searchable databases.' " *State v. Emerson,* 192 Ohio App.3d 446, 2011-Ohio-593, ¶ 10 (8th Dist.), quoting Baringer, CODIS Methods Manual (5th Rev.2009).

forced his tongue into her vagina. The victim convinced the male to allow her to go into the kitchen for water. The suspect maintained control over the [victim] by holding onto her arm and leading her through the house. Once in the kitchen, the victim saw the open rear door, broke free from the grasp of the defendant, and fled down the rear stairs. The male caught the victim on the first floor landing, knocked her to the floor, grabbed her by the head again and twisted more violently as the victim screamed and pounded on the 1st floor neighbor's door. The assault caused the victim to lose consciousness. The suspect fled in an unknown direction.

The victim was treated at the OSU East Hospital where she had a Sexual Assault Kit completed and forensic evidence collected by a Sexual Assault Nurse Examiner. The evidence was submitted to the Columbus Police Property room. The evidence was subsequently sent to the BCI Crime Lab for analysis. Based upon the evidence collected from the body of the victim, A [sic] DNA match was obtained thru [sic] the CODIS Data Base. The CODIS database identified Antiwonne M. Goins * * * as the male who sexually assaulted the female victim.

The affiant, having personal knowledge of the aforementioned stated facts, has probable cause to believe that the buccal swab from the body of Antiwonne M. Goins will further prove his guilt of the crime of Rape, O.R.C., section 2907.02 A-2.

It is requested that, if necessary, reasonable force be used to execute this warrant for the purpose of obtaining the buccal swab standard. In lieu of returning the property/evidence obtained with this warrant, the affiant requests authorization to return such property/evidence in the Columbus Police Property room storage facility of Forensic Crime laboratory.

(Apr. 25, 2014 Suppression Hearing, State's exhibit A.)

{¶ 10} On August 21, 2013, a Franklin County Municipal Court judge issued a search warrant authorizing "Evidence of the crime of Rape 2907.02(A-2) to include an [sic] buccal swab standard from the body of Antiwonne Goins." (Apr. 25, 2014 Suppression Hearing, State's exhibit A.) That same day, Sergeant Pelphrey executed the warrant and obtained two buccal swabs from appellant. The buccal swabs were thereafter submitted to BCI for analysis.

{¶ 11} Two days later, on August 23, 2013, a Franklin County Grand Jury indicted appellant on one count of rape, in violation of R.C. 2907.02, a first-degree felony, one count of gross sexual imposition, in violation of R.C. 2907.05, a fourth-degree felony, one count of felonious assault, in violation of R.C. 2903.11, a second-degree felony, one count of aggravated burglary, in violation of R.C. 2911.11, a first-degree felony, and one count of kidnapping, in violation of R.C. 2905.01, a first-degree felony. All but the gross sexual imposition count included RVO specifications pursuant to R.C. 2941.149.[2]

{¶ 12} On September 12, 2013, BCI issued a laboratory report setting forth the results of the forensic analysis of the DNA sample collected from appellant on August 21, 2013. The report states, in pertinent part, that (1) "[t]he DNA profile from the right breast swabs (Item 1.10) is a mixture consistent with contributions from Antiwonne Goins, [C.G.], and at least one unknown individual," (2) "[t]he DNA profile from the neck swabs (Item 1.12) is a mixture consistent with contributions from Antiwonne Goins and [C.G.]," and (3) "[t]he DNA profile from the external genital swabs (Item 1.11) is a mixture. The major profile is consistent with [C.G.]. Due to insufficient data, the minor profile is not suitable for inclusionary purposes. No conclusions can be made regarding Antiwonne Goins as a possible contributor to the DNA." The report further stated that "Antiwonne Goins cannot be excluded as the non-victim source of the DNA from the neck swabs or as a contributor to the DNA from the right breast swabs." Finally, the report stated that based on the national database provided by the FBI (1) the proportion of the population that could not be excluded as possible contributors to the mixture of DNA profiles on the right breast swabs was 1 in 272 unrelated individuals, and (2) the expected frequency of occurrence of the non-victim DNA profiles from the neck swabs was one in 2 trillion, 188 billion unrelated individuals. (Apr. 25, 2014 Suppression Hearing, State's exhibit D.)

{¶ 13} On January 28, 2014, appellant filed a motion to suppress the evidence obtained pursuant to the arrest and search warrants. On February 11, 2014, plaintiff-appellee, the State of Ohio, filed a memorandum contra. On April 25, 2014, the trial court conducted an evidentiary hearing on appellant's motion to suppress. Following that

---

[2] On July 14, 2014, the trial court orally granted the prosecution's unopposed August 26, 2013 motion to amend the indictment to correct two minor clerical errors.

hearing, the trial court denied appellant's motion upon finding that both the arrest warrant and the search warrant were supported by probable cause.

{¶ 14} Following a four-day trial commencing July 14, 2014, the jury found appellant guilty on all counts charged in the indictment. Thereafter, following a July 29, 2014 bench hearing, the trial court found appellant guilty on the four charged RVO specifications.[3]

{¶ 15} In a judgment entry filed August 22, 2014, the trial court imposed the following terms of incarceration: 11 years on the rape count with an additional 1 year on the RVO specification; 17 months on the gross sexual imposition count; 8 years on the felonious assault count with an additional 5 years on the RVO specification; and 11 years on the aggravated burglary count with an additional 1 year on the RVO specification. Pursuant to R.C. 2941.25, the court merged the kidnapping count with the rape count. The court ordered the sentence on the gross sexual imposition count to be served concurrently with the sentence on the rape count, with all other sentences and RVO penalties to be served consecutively. In sum, appellant received a 37-year prison sentence, to be followed by 5 years of mandatory post-release control. In addition, the trial court classified appellant as a Tier III sex offender with a lifetime registration requirement.

{¶ 16} In a timely appeal, appellant asserts the following two assignments of error:

> [I]. The trial court erred by denying the defense motion to suppress evidence obtained in violation of Defendant-Appellant's rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution and Section 14, Article I, of the Ohio Constitution.

> [II]. The trial court erred in sentencing Defendant-Appellant as a repeat violent offender when the record did not establish the criteria set forth in R.C. 2929.14(B)(2)(b)(ii).

{¶ 17} In his first assignment of error, appellant contends the trial court erred in denying his motion to suppress. More particularly, appellant argues the trial court erred

---

[3] On July 15, 2014, appellant filed a written waiver of his right to jury trial on the RVO specifications.

in determining that the warrants authorizing his arrest and subsequent search of his person for DNA evidence were supported by probable cause.

{¶ 18} At the close of the suppression hearing, the trial court issued an oral decision denying appellant's motion to suppress. In pertinent part, the court stated:

> I want to make clear that I do find Sergeant Pelphrey, Detective Cameron, and the two BCI witnesses very credible, and I find no bad faith or carelessness or reckless shortcuts.
>
> The situation I think is only a little bit unusual in the sense that the CODIS hit letter dated June 7th, 2013, was a preliminary investigative document, not a fully developed analysis with a full chain of custody and so forth. That doesn't diminish the evidentiary value that it had at the time, particularly in the context of this specific crime.
>
> I think that the fact that it was perhaps described a little more generally in the August application for the search warrant that the CODIS data base identified Mr. Goins as the male who sexually assaulted * * * the female victim * * * may have overstated it a little bit, but in a layman's sense was not that far off the mark.
>
> Out of an abundance of caution, BCI & I scientists want more investigation and not to have law enforcement rely on a preliminary hit, but that doesn't mean that they're suggesting that their preliminary hit letters are inaccurate or done in a sloppy or half-baked manner.
>
> And the flip side of that is I think Officer Cameron and CPD and anybody else are entitled, in evaluating whether they have probable cause, to rely upon BCI & I's hit letters, to assume that the scientific protocols are appropriately followed out at the BCI & I lab, that the data is correct, and that an analysis and reporting was done in a reliable fashion.
>
> So when they said at BCI & I that this was a possible investigative lead, that didn't mean that this wasn't sensible evidence reasonably relied upon by law enforcement officers. It effectively, in my layman's sense, said police were on the right track. They needed to do more DNA testing with a new sample that had an unequivocally certain chain of custody in order to maybe to get to a beyond a reasonable doubt standard at trial, but it didn't diminish the evidentiary value of what they already had.

> And I think that to the extent that the affidavit in August might have overstated a little bit the evidentiary material from the CODIS data base as having identified Mr. Goins, quote, as the man who sexually assaulted the female victim, unquote, that that was exactly the same situation that the Supreme Court addressed in State v. Dibble, which for the record is 133 Ohio State 3rd 451; 2012 Ohio 4630.
>
> It's clear to me that the CPD was not fabricating evidence; they weren't disregarding evidence; and they weren't proceeding recklessly. They were not, given a tough case, proceeding in any way that reasonable police officers under the totality of the circumstances wouldn't have done.
>
> So I conclude probable cause was present to issue the arrest warrant based upon the June 7th CODIS hit letter, and that probable cause was still present to get the search warrant in August 2013 after the defendant turned himself in, and therefore, that the constitution of the United States and the state of Ohio have not been violated by what was done here. So the motion is denied.[4]

(Apr. 25, 2014 Suppression Hearing Tr. 144-47.)

{¶ 19} " 'Appellate review of a trial court's decision regarding a motion to suppress evidence involves mixed questions of law and fact.' " *State v. Helmbright,* 10th Dist. No. 11AP-1080, 2013-Ohio-1143, ¶ 11, quoting *State v. Vest,* 4th Dist. No. 00CA2576 (May 29, 2001). "When considering a motion to suppress, the trial court assumes the role of fact finder and, accordingly, is in the best position to resolve factual questions and evaluate witness credibility." *Columbus v. Body,* 10th Dist. No. 11AP-609, 2012-Ohio-379, ¶ 9, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8, citing *State v. Mills,* 62 Ohio St.3d 357, 366 (1992). Accordingly, "an appellate court must accept the trial court's factual findings if they are supported by competent, credible evidence." *Id.* at ¶ 9, citing *Burnside* at ¶ 8, citing *State v. Fanning,* 1 Ohio St.3d 19 (1982). "Accepting these facts as true, the reviewing court must then independently determine, without deference to the trial court's conclusion, whether the facts satisfy the applicable legal

---

[4] In a journal entry filed April 28, 2014, the trial court denied appellant's motion to suppress "[f]or the reasons stated on the record at the conclusion of the hearing on the Motion to Suppress Evidence, conducted April 25, 2014."

standard." *Id.,* citing *Burnside* at ¶ 8, citing *State v. McNamara,* 124 Ohio App.3d 706 (4th Dist.1997).

{¶ 20} We first address appellant's contention that no probable cause supported issuance of the arrest warrant. "In order to issue a valid arrest warrant, probable cause is required." *Teamsters Local Union No. 348 v. Cuyahoga Falls Clerk of Court*, 10th Dist. No. 10AP-728, 2011-Ohio-2416, ¶ 25, citing *Whitely v. Warden, Wyo. State Penitentiary,* 401 U.S. 560, 564 (1971) and Crim.R. 4(A)(1). Crim.R. 4(A)(1) provides in relevant part, that "[i]f it appears from the complaint, or from an affidavit or affidavits filed with the complaint, that there is probable cause to believe that an offense has been committed, and that the defendant has committed it, a warrant for the arrest of the defendant * * * shall be issued * * * to any law enforcement officer authorized by law to execute or serve it." "Probable cause exists when the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a prudent man in believing that an offense had been committed." *Columbus v. Lennex,* 10th Dist. No. 90AP-322 (Aug. 23, 1990), citing *Beck v. Ohio,* 379 U.S. 83, 91 (1964).

{¶ 21} At the suppression hearing, Detective Cameron testified that he sought the arrest warrant for appellant based on the June 7, 2013 BCI notification stating that appellant's DNA was found in C.G.'s vaginal area. Indeed, Detective Cameron averred that the BCI notification stated that "[appellant's] DNA [was] found in [C.G.'s] rape kit," specifically, "in her vagina."   (Apr. 25, 2014 Suppression Hearing Tr. 20, 23.) Appellant claims that this statement was "demonstrably false" and, thus, could not have provided probable cause for the arrest warrant. (Appellant's Brief, 15.) Appellant's "demonstrably false" argument derives from the findings in the September 12, 2013 BCI report that appellant's DNA was found on the neck and breast specimens, but that no conclusions could be made regarding appellant as a possible contributor to the DNA on the vaginal specimens.

{¶ 22} As noted above, BCI's June 7, 2013 notification indicated that "a preliminary association" was made between "specimen G74 13-14458-1.12CPD" and appellant. The notification does not identify the source of "specimen G74 13-14458-1.12CPD," i.e., whether that specimen was recovered from C.G.'s right breast, neck, or vaginal area. Indeed, Ms. Cox, the forensic scientist who authored the June 7, 2013

notification, testified that at the time she prepared the notification she did not know the source of "specimen G74 13-4458-1.12CPD." Thus, Detective Cameron's characterization of the June 7, 2013 notification as stating that appellant's DNA was found in C.G.'s vaginal area was not "demonstrably false." The facts and circumstances known to Detective Cameron on June 8, 2013, the day he requested the arrest warrant against appellant, were that BCI had determined that appellant's DNA was on the specimens taken as part of C.G.'s rape kit, which were collected based on her recounting of the assault. These facts and circumstances were sufficient to warrant a prudent man in believing appellant had committed the rape. The trial court thus did not err in finding that the June 7, 2013 BCI notification provided probable cause supporting Detective Cameron's request for the arrest warrant.

{¶ 23} We next address appellant's claim that the affidavit upon which the search warrant was based failed to support a finding of probable cause, rendering unconstitutional the search of his person for DNA. Specifically, appellant contends that Sergeant Pelphrey's affidavit contains a false statement made with reckless disregard for the truth, and that without that statement, the affidavit fails to establish probable cause.

{¶ 24} "Both '[t]he Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution secure an individual's right to be free from unreasonable searches and seizures, and require warrants to be particular and supported by probable cause.' " *State v. Thomas,* 10th Dist. No. 14AP-185, 2015-Ohio-1778, ¶ 13, quoting *State v. Harris,* 8th Dist. No. 84591, 2005-Ohio-399, ¶ 31. "Probable cause for a search warrant exists when there is a " 'fair probability that contraband or evidence of a crime will be found in a particular place.' " *State v. Williams,* 6th Dist. No. L-12-1238, 2015-Ohio-405, ¶ 108, quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983).

{¶ 25} An individual has a legitimate expectation of privacy in his or her bodily fluids. *Williams* at ¶ 109, citing *Schmerber v. California,* 384 U.S. 757, 770 (1966). The expectation of privacy extends to the DNA in an individual's cells. *Id.,* citing *Smith v. State,* 744 N.E.2d 437, 439 (Ind.2001). Further, " 'using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search.' " *Id.,* quoting *Maryland v. King,* ____ U.S. ____, 133 S.Ct. 1958, 1968-69 (2013).

{¶ 26} Here, the purpose of the search was to obtain a DNA sample via buccal swab for comparison of appellant's DNA to that of the DNA recovered from C.G. during the sexual assault examination. The facts set forth in Sergeant Pelphrey's affidavit in support of the search warrant, taken as true, arguably would provide the judge issuing the search warrant a substantial basis for concluding a fair probability existed that a sample of appellant's DNA via the buccal swab compared with the DNA evidence recovered from C.G. would confirm the match obtained from a search of the CODIS system. *See, e.g., Williams* at ¶ 111 (search warrant affidavit stating that "[a] cigarette butt found [at the crime scene] was analyzed by BCI and a CODIS match was obtained identifying [the defendant] as a major contributor" and that "[a]dditional standards are required by * * * [BCI] from [the defendant] for further testing relative to this evidence" and that "[a] buccal swab from [the defendant] is needed for such additional testing" provided probable cause for issuance of a search warrant of the defendant's person).

{¶ 27} In the present case, however, appellant contests the facts contained in Sergeant Pelphrey's affidavit. Specifically, appellant challenges Sergeant Pelphrey's statement that "[t]he CODIS database identified Antiwonne M. Goins * * * as the male who sexually assaulted the female victim." Appellant contends this statement is false and was made with reckless disregard for the truth.

{¶ 28} " 'In reviewing the sufficiency of probable cause in an affidavit submitted in support of a search warrant issued by a magistrate, neither a trial court nor an appellate court should substitute its judgment for that of the magistrate by conducting a *de novo* determination as to whether the affidavit contains sufficient probable cause upon which that court would issue the search warrant. Rather, the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In conducting any after-the-fact scrutiny of an affidavit submitted in support of a search warrant, trial and appellate courts should accord great deference to the magistrate's determination of probable cause, and doubtful or marginal cases in this area should be resolved in favor of upholding the warrant.' " *State v. Dibble,* 10th Dist. No. 13AP-798, 2014-Ohio-5754, ¶ 10, quoting *State v. George*, 45 Ohio St.3d 325 (1989), paragraph two of the syllabus, citing *Gates*.

{¶ 29} " 'To successfully attack the veracity of a facially sufficient search warrant affidavit, a defendant must show by a preponderance of the evidence that the affiant made a false statement, either "intentionally, or with reckless disregard for the truth." ' " *State v. Johnson,* 10th Dist. No. 13AP-637, 2014-Ohio-671, ¶ 10, quoting *State v. Waddy,* 63 Ohio St.3d 424, 441 (1992), quoting *Franks v. Delaware,* 438 U.S. 154, 155 (1978). " 'Reckless disregard' occurs when an affiant has serious doubts about the truth of an assertion." *Id.*, citing *Waddy.*

{¶ 30} " 'The burden of showing something by a preponderance of the evidence * * * simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before [the trier of fact] may find in favor of the party who has the burden to persuade [the trier of fact] of the fact's existence.' " *State v. Bates,* 5th Dist. No. 08 CA 15, 2009-Ohio-275, ¶ 35, quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602, 622 (1993). "In other words, the preponderance standard goes to how convincing the evidence in favor of a fact must be in comparison with the evidence against it before that fact may be found, but does not determine what facts must be proven as a substantive part of a claim or defense." *Id.,* citing *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121 (1997).

{¶ 31} "In assessing whether a party has met its burden of proof, the Ohio Supreme Court has stated, '[t]he degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value.' " *Id.* at ¶ 36, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954).

{¶ 32} When asked why he included in his affidavit the statement that "[t]he CODIS database identified Antiwonne Goins * * * as the male who sexually assaulted the female victim," Sergeant Pelphrey explained: "That is the information that we get. The CODIS administrator sends us a letter. When we submit evidence to BCI, it goes through evidence handling, then to forensic biology, to the DNA section. And then if there is some sort of result from the DNA section, then it goes to the CODIS administrator. If it hits in CODIS, then a letter is generated back to the investigator, telling us that it's a hit, here is

who it hit on.  * * * So the letter that we received from BCI kind of gives us instructions for our next investigative step."  (Apr. 25, 2014 Suppression Hearing Tr. 94-95.)

{¶ 33} Sergeant Pelphrey further testified that when he requested the search warrant, he "had every reason to believe that the name listed on the BCI hit letter was going to be our suspect, and that the buccal swab cell standard that we were going to get via the search warrant was going to confirm that."  (Apr. 25, 2014 Suppression Hearing Tr. 99.)  He had no "serious doubts" about the statement he made in the affidavit or that "in the context of [the] investigation that [appellant was] the perpetrator."  (Apr. 25, 2014 Suppression Hearing Tr. 98.)

{¶ 34} On cross-examination, Sergeant Pelphrey acknowledged that the June 7, 2013 BCI letter did not expressly state that appellant committed the sexual assault. He further averred, however, that he "believed" the challenged statement in the affidavit was "an accurate statement."  (Apr. 25, 2014 Suppression Hearing Tr. 106.)  Thereafter, the following colloquy occurred between defense counsel and Sergeant Pelphrey:

> Q. So you believe the letter that you got from Hannah Cox says that Mr. Goins sexually assaulted the victim?
>
> A. I believe the evidence that was recovered from the sexual assault examination kit that was presented to BCI was tested and resulted in the name of Antiwonne Goins as the contributor of the evidence."
>
> Q. But on here you didn't say that.  You said "as the male who sexually assaulted the female victim," correct?
>
> A. Well, sexual assault is the crime that we are referring to and investigating, so yes.
>
> Q. And you're saying that he's the one who committed that crime on this letter according to what you wrote here then?
>
> A. That is my belief, yes.

(Apr. 25, 2014 Suppression Hearing Tr. 106.)

{¶ 35} In *Dibble*, the Supreme Court held that "[a] determination whether information in a search-warrant affidavit is false must take into account the nontechnical language used by nonlawyers."  *Id.* at ¶ 24.  In so holding, the court applied the reasoning

employed by the United States Supreme Court in *United States v. Ventresca,* 380 U.S. 102, 108 (1965):

> If the teachings of the [United States Supreme] Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

*Dibble* at ¶ 24.

{¶ 36} The trial court, having heard the witnesses testify, was in a far better position to evaluate their testimony than a reviewing court. As noted above, Sergeant Pelphrey testified that when he requested the search warrant he had "every reason to believe" that the BCI notification identified appellant as the perpetrator of the crimes and that the retrieval of appellant's DNA would confirm that fact. (Apr. 25, 2014 Suppression Hearing Tr. 99.) He further averred that he had "no serious doubts" about the challenged statement and that he "believed" the statement to be accurate. (Apr. 25, 2014 Suppression Hearing Tr. 99, 106.) The trial court found Sergeant Pelphrey to be a credible witness. The court specifically noted that it was clear that he had neither fabricated evidence nor proceeded recklessly. The court found that while the language used in the affidavit indicating that CODIS identified appellant as the man who sexually assaulted C.G. may have been an overstatement, it was "not far off the mark" in a layman's sense of the words. (Apr. 25, 2014 Suppression Hearing Tr. 144.) Further, the evidence established a DNA match between the swabs included in C.G.'s rape kit and the buccal swabs taken from appellant.

{¶ 37} "Probable cause to search does not require proof that a crime was actually committed, merely the fair probability that evidence of a crime will be found at the location described." *Bates* at ¶ 44, citing *George* at 325. A review of the record in this case shows there is competent, credible evidence to support the trial court's denial of the

motion to suppress on the basis that there was probable cause for the issuance of the search warrant of appellant's person. The facts in the affidavit in support of the warrant were drafted by a non-lawyer in the midst and haste of a criminal investigation. Those facts, when read in their entirety and interpreted in a common sense and realistic manner, gave the judge issuing the search warrant a substantial basis for concluding a fair probability existed that a sample of appellant's DNA via the buccal swab compared with the DNA evidence in C.G.'s rape kit would confirm the match obtained from a search of the CODIS system.

{¶ 38} For the foregoing reasons, we find the trial court did not err when it denied appellant's motion to suppress. Accordingly, appellant's first assignment of error is overruled.

{¶ 39} In his second assignment of error, appellant contends that the trial court erred in sentencing him as an RVO. Specifically, appellant claims that the record does not establish the criteria set forth in R.C. 2929.14(B)(2)(b) and (c).

{¶ 40} "An appellate court will not disturb a trial court's sentencing decision unless the evidence is clear and convincing that either the record does not support the sentence or that the sentence is contrary to law." *State v. Chandler,* 10th Dist. No. 04AP-895, 2005-Ohio-1961, ¶ 10, citing *State v. Maxwell,* 10th Dist. No. 02AP-1271, 2004-Ohio-5660, ¶ 27, citing *State v. Comer,* 99 Ohio St.3d 463, 2003-Ohio-4165, ¶ 10. "In determining whether a sentence is contrary to law, an appellate court reviews the record to determine whether the trial court considered the appropriate factors, made the required findings, gave the necessary reasons for its findings, and properly applied the statutory guidelines." *Id.,* citing *Maxwell* at ¶ 27, citing *State v. Altalla,* 10th Dist. No. 03AP-1127, 2004-Ohio-4226, ¶ 7. "We are also cognizant of the two-step standard of review set forth by a plurality of the Supreme Court of Ohio in *State v. Kalish,* 120 Ohio St.3d 23, 2008-Ohio-4912, which asks (1) whether the trial court adhered to all applicable rules and statutes in imposing the sentence, and (2) whether a sentence within the permissible statutory range constitutes an abuse of discretion." *State v. Murphy*, 10th Dist. No. 12AP-952, 2013-Ohio-5599, ¶ 12. Under either standard of review, the trial court did not err when it imposed sentence on the RVO specifications.

{¶ 41} Under certain circumstances, RVO sentencing is mandatory. R.C. 2929.14(B)(2) provides, in relevant part:

> (b) The court shall impose on an offender the longest prison term authorized or required for the offense and shall impose on the offender an additional definite prison term of one, two, three, four, five, six, seven, eight, nine, or ten years if all of the following criteria are met:
>
> (i) The offender is convicted of * * * a specification of the type described in section 2941.149 of the Revised Code that the offender is a repeat violent offender.
>
> (ii)  The offender within the preceding twenty years has been convicted of or pleaded guilty to three or more offenses described in division (CC)(1) of section 2929.01 of the Revised Code, including all offenses described in that division of which the offender is convicted or to which the offender pleads guilty in the current prosecution and all offenses described in that division of which the offender previously has been convicted or to which the offender previously pleaded guilty, whether prosecuted together or separately.
>
> (iii)  The offense or offenses of which the offender currently is convicted * * * is * * * any felony of the first degree that is an offense of violence and the court does not impose a sentence of life imprisonment without parole, or any felony of the second degree that is an offense of violence and the trier of fact finds that the offense involved an attempt to cause or a threat to cause serious physical harm to a person or resulted in serious physical harm to a person.
>
> (c) For purposes of division (B)(2)(b) of this section, two or more offenses committed at the same time or as part of the same act or event shall be considered one offense, and that one offense shall be the offense with the greatest penalty.

{¶ 42} In addition, R.C. 2929.14(B)(2)(e) provides that "[w]hen imposing a sentence pursuant to division (B)(2)(a) or (b) of this section, the court shall state its findings explaining the imposed sentence."

{¶ 43} At the July 29, 2014 hearing on the RVO specifications, the state presented a certified copy of an August 15, 1997 judgment entry entered by the Franklin County Court of Common Pleas convicting appellant of involuntary manslaughter with a firearm

specification and aggravated robbery. Following arguments of counsel, the trial court found appellant guilty of the RVO specifications attached to the rape, aggravated burglary, felonious assault, and kidnapping counts in the current case and set a sentencing hearing for August 21, 2014.

{¶ 44} At the sentencing hearing, the parties and the trial court engaged in a lengthy discussion regarding the facts underlying appellant's 1997 convictions and his present convictions, as well as how those facts related to mandatory RVO sentencing. Following that discussion, the trial court stated, as follows:

> As to the repeat violent offender, the court finds that the defendant committed two separate crimes in 97CR-405; that is, an involuntarily [sic] manslaughter, F1, and aggravated robbery, F1. But, under this rather byzantine language in the sentencing code, we have to treat two or more offenses as one conviction, or one violation, for RVO purposes, if they were "committed at the same time, or as part of the same act or event."
>
> From what I can tell, the 97CR-405 has to be regarded as the same "event," the home invasion with the shooting as the people were leaving. The descriptions, to the extent I've got them, seem to show that's what happened. That statute in question is [R.C.] 2929.14(B)(2)(c).
>
> The same analysis has to be done in this case. Four F1 crimes were committed on May 31st, but here I reach the conclusion that two of them were sufficiently distinct as not to be part of the "same time" or "same act" or "same event" under the [R.C.] 2929.14(B)(2)(c) analysis. Specifically, I think that the rape/GSI, which went with the rape, kidnapping, and the agg[ravated] burg[lary] were all sufficiently separate in time and place from the felonious assault in the hallway, that the second felonious assault, for lack of a better way to phrase it, after the victim had essentially tried to escape down the back staircase, was caught, beaten, strangled, that we have two separate violent offenses for the purpose of the RVO spec statutes.
>
> And I don't think that just as the stuff in the bedroom occurred geographically somewhat removed, and in time somewhat removed, and in criminal animus, somewhat removed from the acts in the back stairway, I think those two separate matters constitute two convictions and can be

considered. In short, that means that the defendant has three RVOs and is subject to a mandatory RVO sentencing.

* * *

To the extent I have to make findings under [R.C.] 2929.14(B), all the offenses involved with these RVO specs were felony 1 or felony 2 offenses of violence involving an attempt to cause, or threat to cause, serious physical harm to a person, and they resulted in serious physical harm to the victims. Serious physical harm to persons is defined in [R.C.] 2901.01(A)(5).

(Tr. Vol. VI, 31-33.)

{¶ 45} Appellant contends that the sole issue in this assignment of error is whether the acts for which he was convicted in the current prosecution constitute one or two qualifying offenses for purposes of RVO analysis. Such depends on the meaning of the phrase "two or more offenses committed at the same time or as part of the same act or event." R.C. 2929.14(B)(2)(c). Appellant argues that the term "event" is ambiguous and that this ambiguity is of particular significance in the present case "because all of the actions allegedly occurring on May 31 could be considered part of the same 'event.' " (Appellant's Brief, 20.)

{¶ 46} Citing the "rule of lenity," appellant argues that because the term "event" as used in R.C. 2929.14(B)(2)(c) is ambiguous, we must construe that term in his favor and against the state. The "rule of lenity" is a principle of statutory construction codified in R.C. 2901.04(A), which provides, in relevant part that: "sections of the Revised Code defining offenses or penalties shall be strictly construed against the state, and liberally construed in favor of the accused." Application of the rule of lenity prevents a court from interpreting a criminal statute so as to increase the penalty it imposes on an offender where the intended scope of the statute is ambiguous. *State v. Elmore,* 122 Ohio St.3d 472, 2009-Ohio-3478, ¶ 38, citing *Moskal v. United States,* 498 U.S. 103, 107-08 (1990). Under the rule, ambiguity in criminal statutes "is construed strictly so as to apply the statute only to conduct that is clearly proscribed." *Id.* at ¶ 38, citing *United States v. Lanier,* 520 U.S. 259, 266 (1997).

{¶ 47} Neither appellant nor the state has provided any case law addressing whether the term "event" as used in R.C. 2929.14(B)(2)(c) is ambiguous. We need not reach that question, however, because appellant qualified for discretionary RVO sentencing pursuant to the criteria set forth in R.C. 2929.14(B)(2)(a). That section provides, in pertinent part:

> If division (B)(2)(b) of this section does not apply, the court may impose on an offender, in addition to the longest prison term authorized or required for the offense, an additional definite prison term of one, two, three, four, five, six, seven, eight, nine, or ten years if all the following criteria are met:
>
> (i)  The offender is convicted of * * * a specification of the type described in section 2941.149 of the Revised Code that the offender is a repeat violent offender.
>
> (ii) The offense of which the offender currently is convicted * * * is * * * any felony of the first degree that is an offense of violence and the court does not impose a sentence of life imprisonment without parole, or any felony of the second degree that is an offense of violence and the trier of fact finds that the offense involved an attempt to cause or a threat to cause serious physical harm to a person or resulted in serious physical harm to a person.
>
> (iii)  The court imposes the longest prison term for the offense that is not life imprisonment without parole.
>
> (iv)  The court finds that the prison terms imposed pursuant to division (B)(2)(a)(iii) of this section * * * are inadequate to punish the offender and protect the public from future crime, because the applicable factors under section 2929.12 of the Revised Code indicating a greater likelihood of recidivism outweigh the applicable factors under that section indicating a lesser likelihood of recidivism.
>
> (v) The court finds that the prison terms imposed pursuant to division (B)(2)(a)(iii) of this section * * * are demeaning to the seriousness of the offense, because one or more of the factors under section 2929.12 of the Revised Code indicating that the offender's conduct is more serious than conduct normally constituting the offense are present, and they outweigh the applicable factors under that section indicating that the

offender's conduct is less serious than conduct normally constituting the offense.

{¶ 48} In addition to its findings regarding mandatory RVO sentencing, the trial court made the following findings applicable to R.C. 2929.14(B)(2)(a):

> I would note for the Court of Appeals one final thing. Even if RVO were not mandatory here, I think the findings can be made that the likelihood of recidivism is so extraordinarily high and the seriousness factors are so extraordinarily high when viewed from [R.C.] 2929.12, that the offender's misconduct in this case really does justify imposition of these RVO extra terms on top of maximum sentences on the charges. The crimes were more serious than those normally constituting the offense.

(Tr. Vol. VI, 44.)

{¶ 49} Because appellant qualified for discretionary RVO sentencing, pursuant to R.C. 2929.14(B)(2)(a), and because the trial court made the necessary findings before imposing sentence as required by R.C. 2929.14(B)(2)(e), any error in the imposition of sentence under R.C. 2929.14(B)(2)(b) and (c) is without consequence, as appellant's sentence would remain the same even if he did not qualify for mandatory RVO sentencing. Upon review of the record, we conclude that the trial court considered the appropriate factors, made the required findings, gave the necessary reasons for its findings and properly applied the statutory guidelines before sentencing appellant on the RVO specifications. Clear and convincing evidence establishes that the record supports the sentence and that the sentence is not contrary to law. *Chandler* at ¶ 10.

{¶ 50} For the foregoing reasons, we find that the trial court properly imposed sentence on the RVO specifications. Accordingly, appellant's second assignment of error is overruled.

{¶ 51} Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and BRUNNER, JJ., concur.

––––––––––––––––––