[Cite as *In re R.Z.*, 2022-Ohio-3630.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| IN RE R.Z. | : | APPEAL NO. | C-210660 |
| | | TRIAL NO. | 21-599X |
| | : | | |
| | : | | |
| | : | *O P I N I O N.* | |

Appeal From: Hamilton County Juvenile Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: October 12, 2022

*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Mary Stier,* Assistant Prosecuting Attorney, for Plaintiff-Appellant,

*Raymond T. Faller,* Hamilton County Public Defender, and *Joshua Thompson,* Assistant Public Defender, for Defendant-Appellee.

**Bock, Judge.**

{¶1}   The state appeals the juvenile court's order, which found no probable cause to believe that defendant-appellee R.Z. committed acts that would constitute burglary under R.C. 2911.12(A)(1) if committed by an adult. In response, R.Z. challenges the juvenile court's and this court's jurisdiction. For the following reasons, we hold that we have jurisdiction over the case and affirm the juvenile court's order.

## I. Facts and Procedure

{¶2}   In 2015, Carolyn Johnson woke up and found her house in disarray. Suspecting a burglary, she called the police. As part of the investigation, detective Carl Blackwell swabbed an out-of-place kitchen knife and two liquor bottles for biological evidence and submitted the swabs to the Hamilton County Crime Laboratory for DNA testing. In March 2016, Blackwell received a testing report, which noted the presence of "a mixture of DNA from at least three individuals" on the knife. From that mixture, the laboratory identified a major DNA profile that "originated from a male individual." The police uploaded that profile to the Combined DNA Index System ("CODIS").

{¶3}   In January 2021, the Ohio Bureau of Criminal Investigation ("BCI") notified the laboratory:

> During a search of Ohio's DNA Index System (SDIS), a preliminary association was made between Hamilton County Coroner's Laboratory specimen CL1511236 #1-2 and the below individual.
>
> **Any possible connection or involvement of the individual to the case must be determined through further investigation.**
> This investigative lead is not intended to replace the forensic laboratory's reporting document. **An additional DNA sample from**

> **the following individual must be obtained for verification by**
>
> **the forensic laboratory.**

(Emphasis in original.) The following month, Blackwell filed a complaint in the juvenile court alleging that R.Z. was delinquent under R.C. 2152.02 for committing an act that would constitute burglary under R.C. 2911.12(A)(1) if performed by an adult. In 2015, R.Z. was 15 years old.

{¶4}   In October 2021, the state asked the juvenile court to relinquish its jurisdiction and transfer the case to the adult court under Juv.R. 30(A). In December 2021, the juvenile court held an R.C. 2152.12 bindover hearing to determine whether probable cause existed to believe that R.Z. had committed the alleged act. At the hearing, the state's evidence consisted of testimony from Blackwell, crime scene photographs, the 2016 DNA test results, and the 2021 BCI notification.

{¶5}   Relevant here, Blackwell described how he "received that preliminary hit on [R.Z.]"—he "believe[d] [R.Z.] was charged on an unrelated incident" and "would imagine [that] once he was arrested his DNA was swabbed." Blackwell agreed that the hit was based on "other DNA." After he received the notification, Blackwell filed the complaint because he "had enough from the DNA sample to—[he] had enough probable cause from the DNA sample returned from the Coroner's office to file a charge against him for burglary, because his DNA was found on the knife." Blackwell acknowledged that he never took a known sample from R.Z. and that the preliminary association "has yet to be verified."

{¶6}   Following the parties' closing arguments, the juvenile court found:

> [I]n light of particularly the BCI investigation report which appears to
>
> be the sole piece of identifying information in this case, that the state

has not met their burden. There is no probable cause here.

However, that means that it is dismissed for want of prosecution. It can

always be re-filed.

The juvenile court's entry reiterated that finding—the evidence was insufficient to establish probable cause, and the case was dismissed "without prejudice for want of prosecution."

**{¶7}** The state appeals and challenges the juvenile court's probable-cause determination.

## II. Law and Analysis

**{¶8}** Before reaching the merits, we must address R.Z.'s procedural and jurisdictional assertions related to this appeal. First, he contends the bindover hearing was not within the scope of the juvenile court's jurisdiction. Second, he argues the juvenile court's judgment finding no probable cause and dismissing the case without prejudice was not a final order from which the state could appeal as a matter of right under R.C. 2945.67(A). For its part, the state failed to file a reply brief. But after a review of the relevant statutes and case law, we disagree with R.Z.'s propositions.

### A. The Juvenile Court Had Jurisdiction

**{¶9}** R.Z. challenges the juvenile court's jurisdiction. Relevant here, the Ohio legislature has vested the juvenile court with exclusive subject-matter jurisdiction over "any child who on or about the date specified in the complaint" was alleged to be delinquent. R.C. 2151.23(A)(1). Framed in terms of this case, the issue is whether R.Z. fell under R.C. 2152.02's statutory definition of a child at the time of the bindover hearing. R.Z. answers no and interprets R.C. 2152.02(C)(6) to narrow the juvenile court's jurisdiction to a period "until the person attains twenty-one years of age."

4

Applying this interpretation of the statute, R.Z. explains that he was 20 years old when the complaint was filed and 21 years old when the trial court held the hearing. And the Ohio Supreme Court has stated, "juvenile courts do not have jurisdiction over adjudicated delinquents once they are 21 years old." *See In re J.V.,* 134 Ohio St.3d 1, 2012-Ohio-4961, 979 N.E.2d 1203, ¶ 23. Thus, R.Z. contends the juvenile court lacked jurisdiction to entertain the state's bindover motion.

{¶10} We disagree and hold that R.Z.'s bindover hearing was within the juvenile court's jurisdiction because he was apprehended for the acts charged before he turned 21 years old.

{¶11} Under R.C. 2152.02(C)(1), a child is a person under 18 years of age. But a person under 18 years old who commits an act in violation of a federal or state law "shall be deemed a 'child' irrespective of that person's age at the time the complaint with respect to that violation is filed or the hearing on the complaint is held." R.C. 2152.02(C)(2). Still more, a person is *not* a child if the alleged act occurred before the person reached 18 years old and the person was "not taken into custody or apprehended for that act" until after the person turned 21 years old. R.C. 2152.02(C)(3). In other words, a person is a "child" if the allegedly delinquent conduct was committed before the person turned 18 years old and the person was apprehended before turning 21 years old. R.C. 2152.02(C)(2) and (3). The statutory text is clear—a person is a "child" under the statute if the alleged violation was committed before the person turned 18 years old and the complaint was filed before the person turned 21 years old "irrespective of that person's age at the time * * * the hearing on the complaint is held." *Id.*

5

{¶12} R.Z. relies on R.C. 2152.02(C)(6), which states,

The juvenile court has jurisdiction over a person who is adjudicated a delinquent child * * * prior to attaining eighteen years of age until the person attains twenty-one years of age, and, for purposes of that jurisdiction related to that adjudication, except as otherwise provided in this division, a person who is so adjudicated a delinquent child or juvenile traffic offender shall be deemed a 'child' until the person attains twenty-one years of age. If a person is so adjudicated a delinquent child or juvenile traffic offender and the court makes a disposition of the person under this chapter, at any time after the person attains twenty-one years of age, the places at which the person may be held under that disposition are not limited to places authorized under this chapter solely for the confinement of children, and the person may be confined under that disposition, in accordance with division (F)(2) of section 2152.26 of the Revised Code, in places other than those authorized under this chapter solely for the confinement of children.

{¶13} A similar provision of the statute, R.C. 2151.23(I), limits the exclusive jurisdiction of the juvenile court when "(1) the defendant [was] under eighteen years of age at the time of the offense; (2) the alleged offense would be a felony if committed by an adult; and (3) the defendant [was not] 'taken into custody or apprehended' for the offense prior to turning twenty-one years of age." *In re H.C.*, 8th Dist. Cuyahoga No. 102601, 2015-Ohio-3676, ¶ 10, quoting R.C. 2151.23(I). And recently the Ohio Supreme Court held that the juvenile court had exclusive subject-matter jurisdiction over a person taken into custody before turning 21 years of age for acts committed

when he was 17 years old. *See State v. Hudson*, Slip Opinion No. 2022-Ohio-1435, ¶ 3 (interpreting R.C. 2152.02(C)(3) and 2151.23(I)).

{¶14} The Ohio Supreme Court has repeatedly stated that R.C. 2152.02 makes "the age of the offender upon apprehension the touchstone of determining juvenile-court jurisdiction." *State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 14; *see Bear v. Buchanan,* 156 Ohio St.3d 348, 2019-Ohio-931, 126 N.E.3d 1115, ¶ 5 (quoting *Walls* at ¶ 14). What matters is whether the delinquency proceeding in question is a "hearing on the complaint." *See State ex rel. Jean-Baptiste v. Kirsch,* 134 Ohio St.3d 421, 2012-Ohio-5697, 983 N.E.2d 302, ¶ 23.

{¶15} Consider some examples. A juvenile court "does not patently and unambiguously lack jurisdiction to proceed with the delinquency case even though N.A. turned 21 years old before the case concluded" when N.A. was apprehended before he turned 21 for alleged acts that occurred before he turned 18. *State ex rel. N.A. v. Cross*, 125 Ohio St.3d 6, 2010-Ohio-1471, 925 N.E.2d 614, ¶ 2-3, 14. In contrast, a juvenile court was divested of its jurisdiction over a person that "had not been apprehended for committing the offense until after he turned 21 years of age." *State v. Taylor*, 8th Dist. Cuyahoga No. 105322, 2017-Ohio-8066, ¶ 14.

{¶16} Yet, as R.Z. points out, the Ohio Supreme Court has also explained that "juvenile courts have jurisdiction over adjudicated delinquents until they are 21 years old. The obvious flip side of that statement is that juvenile courts do not have jurisdiction over adjudicated delinquents once they are 21 years old." *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, 979 N.E.2d 1203, at ¶ 23. But *In re J.V.* and the other cases cited by R.Z. concerned the application of R.C. 2152.02(C)(6) to individuals who were adjudicated delinquent before reaching 18 years of age. *See id.* at ¶ 1 and 23 (17

years old when adjudicated delinquent); *see also In re R.B.*, 162 Ohio St.3d 281, 2020-Ohio-5476, 165 N.E.3d 288, ¶ 13 (14 years old when adjudicated delinquent). The plain language of R.C. 2152.02(C)(6) is clear—that section of the statute applies where an individual was "adjudicated a delinquent child * * * prior to attaining eighteen years of age." And the Supreme Court of Ohio has explained that R.C. 2152.02(C)(6) is of no concern when the person who committed the act in question is "not adjudicated a delinquent child before he was 18 years old." *Id.* at ¶ 11. Still more, "a person over the age of 18, who is deemed a child pursuant to the second clause of R.C. 2152.02(C)(6), is so deemed for purposes other than determining jurisdiction." *In re Andrew*, 119 Ohio St.3d 466, 2008-Ohio-4791, 895 N.E.2d 166, ¶ 6. In fact, this section of the statute modifies the authority of the juvenile court to confine the person after the person's 21st birthday. In these instances, the places the individual may be confined "are not limited to places authorized under this chapter solely for the confinement of children." R.C. 2152.02(C)(6).

{¶17} Finally, R.Z. cites the Ohio Supreme Court to argue that that the jurisdiction of the juvenile court exists " 'until terminated or modified by the court or until the child attains twenty-one years of age.' " *In re A.W.*, 160 Ohio St.3d 183, 2020-Ohio-1457, 155 N.E.3d 819, ¶ 7, quoting R.C. 2152.22(A). Likewise, other sections of the statute restrict the juvenile court from committing a delinquent child to the custody of the Department of Youth Services "for a period that exceeds the child's attainment of twenty-one years of age." R.C. 2152.17. But these statutes merely "restrict the juvenile court's dispositional power to commit delinquent children to the custody of the Department of Youth Services only until they are 21 years old." *Cross,* 125 Ohio St.3d 6, 2010-Ohio-1471, 925 N.E.2d 614, at ¶ 12.

{¶18} Thus, we hold that the juvenile court had jurisdiction over R.Z. under the plain language of R.C. 2152.02(C)(2) and (3) because R.Z. allegedly committed the acts before he turned 18 years old and was apprehended before he turned 21 years old.

B. The State Exercised its Right to Appeal From a Final Order

{¶19} Next, we must determine whether the juvenile court's denial of the motion for a discretionary bindover based on a finding of no probable cause and dismissal of the complaint is a final, appealable order that the state may appeal as a matter of right under R.C. 2945.67(A). In other words, we must determine if we have jurisdiction over the appeal, because an appellate court's jurisdiction is limited to final orders and judgments. *See In re J.P.*, 2022-Ohio-539, 185 N.E.3d 626, ¶ 6 (1st Dist.), citing Ohio Constitution, Article IV, Section 3(B)(2). Under R.C. 2945.67(A), the state "may appeal as a matter of right" a juvenile court's decision in a delinquency case that "grants a motion to dismiss all or any part of an indictment, complaint, or information." For all other types of decisions in a delinquency case, the prosecutor "may appeal by leave of the [appellate] court." R.C. 2945.67(A). Because the state has not sought leave, we can proceed if the state has an appeal as a matter of right.

{¶20} The state maintains that the juvenile court's order was, in effect, an order denying a motion for a mandatory bindover because the order "bar[red] the state from prosecuting a juvenile offender as an adult." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5370, 879 N.E.3d 629, ¶ 1. R.Z. disagrees, emphasizing that this was a discretionary-bindover hearing, and stresses the continuing jurisdiction of a juvenile court over a delinquency case when it overrules a motion for a discretionary bindover. The discretionary-mandatory distinction is significant, because a finding of no probable cause for mandatory offenses "is the functional equivalent of a dismissal of a

9

criminal indictment and constitutes a final order from which the state may appeal as a matter of right." *Id.* Particularly, a juvenile court's decision finding a child amenable to rehabilitation and denying the state's request for a discretionary bindover is not the " 'functional equivalent of a dismissal of a criminal indictment' and there is no authority under R.C. 2945.67(A) for the state to appeal as a matter of right." *In re M.P.,* 124 Ohio St.3d 445, 2010-Ohio-7028, ¶ 16, quoting *In re A.J.S.* at ¶ 1.

{¶21} One court has harmonized *In re A.J.S.* and *In re M.P.* to hold that an order denying a discretionary bindover based on a lack of probable cause is the equivalent of a dismissal of a criminal indictment, and the state has an appeal as a matter of right, because that order "forecloses criminal prosecution in adult court." *In re D.M.S.,* 2d Dist. Montgomery No. 28783, 2020-Ohio-7028, ¶ 12. R.Z. disagrees and argues extensively that a decision denying a discretionary bindover based on a lack of probable cause is readily distinguishable from a dismissal of a criminal indictment because the delinquency case continues to exist in the juvenile court.

{¶22} But this argument fails to recognize that the juvenile court dismissed the complaint after it denied the discretionary bindover based on a lack of probable cause. And a juvenile court's sua sponte dismissal of a delinquency charge after finding no probable cause "is the equivalent of a 'decision grant[ing] a motion to dismiss' under R.C. 2945.67(A)." *In re S.J.*, 106 Ohio St.3d 11, 2005-Ohio-3215, 829 N.E.2d 1207, ¶ 13, quoting *State v. Ryan*, 17 Ohio App.3d 150, 478 N.E.2d 257 (1st Dist.1984). While the juvenile court dismissed the case without prejudice, R.C. 2945.67(A) "clearly affords the state the right to appeal, as a matter of right, *any* decision that grants a motion to dismiss, without requiring that the dismissal be with prejudice." (Emphasis in original.) *State v. Craig*, 116 Ohio St.3d 135, 2007-Ohio-5752, 876 N.E.2d 957, ¶ 13.

{¶23} Next, R.Z. argues that the juvenile court's order was not a final, appealable order under R.C. 2505.02(B). That statute identifies several categories of final, appealable orders. Relevant here, the juvenile court's order was a final, appealable order under R.C. 2505.02(B)(4) if "it ha[d] the effect of determin[ing] the action with respect to the provisional remedy and prevent[ing] a judgment in the action in favor of the appealing party with respect to the provisional remedy" and "[t]he appealing party would not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action." *Smith v. Chen*, 142 Ohio St.3d 411, 2015-Ohio-1480, 31 N.E.3d 633, ¶ 5. R.Z. does not dispute that the discretionary-bindover hearing was a provisional remedy as defined in R.C. 2505.02(A)(3). And he agrees that the juvenile court's order determined the action with respect to the provisional remedy.

{¶24} Rather, R.Z. argues that the state would be afforded a meaningful remedy. But this argument fails to account for the caselaw holding that a juvenile court's denial of a bindover "prevents the state from obtaining a meaningful or effective remedy by way of appeal at the conclusion of those proceedings." *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 28; *see In re S.J.* at ¶ 13 (holding that an order dismissing a charge after finding no probable cause "is final, as it affects a substantial right and prevented a judgment on the murder charges"); *In re D.M.S.,* 2d Dist. Montgomery No. 28783, 2020-Ohio-7028, at ¶ 21 ("the State would lack a meaningful remedy to challenge the juvenile court's probable cause determination after the end of juvenile court proceedings"). We hold that the juvenile court's order was a final, appealable order under R.C. 2505.02(B).

11

C. The State Failed to Establish Probable Cause

**{¶25}** The state challenges the juvenile court's probable-cause determination. Generally, an appeal challenging a probable-cause finding in a bindover proceeding "involves questions of both fact and law." *In re A.J.S.* at ¶ 51. But the existence of probable cause is a question of law that we review de novo. *Id.* at ¶ 47.

**{¶26}** At a bindover hearing, the state has the burden of producing sufficient and credible evidence of every element of an offense to support a finding that probable cause existed to believe that the child committed the charged offense. *In re T.S.*, 1st Dist. Hamilton No. C-200267, 2021-Ohio-1889, ¶ 12, citing *In re A.J.S.* at ¶ 42, citing *State v. Iacona*, 93 Ohio St.3d 83, 93, 752 N.E.2d 937 (2001). In other words, the state must produce evidence that "raises more than a mere suspicion of guilt, but need not provide evidence proving guilt beyond a reasonable doubt." *A.J.S.* at ¶ 42, citing *Iacona* at 93. When reviewing the evidence, the juvenile court acts as a gatekeeper "charged with evaluating whether sufficient credible evidence exists" to warrant transfer of the case to adult court. *Id.* at ¶ 42, citing *In re A.J.S.,* 173 Ohio App.3d 171, 2007-Ohio-3216, 877 N.E.2d 997 (10th Dist.). That is to say, the juvenile court must evaluate the quality of the state's evidence and any evidence that attacks probable cause. *Iacona* at 93. Probable-cause determinations require "a fact-intensive inquiry." *State v. Davis*, 9th Dist. Summit No. 29273, 2020-Ohio-473, ¶ 19; *see State v. Young,* 10th Dist. Franklin No. 18AP-845, 2019-Ohio-4639, ¶ 20 ("probable cause determinations are intensely fact-specific").

**{¶27}** We note that "[p]robable cause is a flexible concept grounded in fair probabilities which can be gleaned from considering the totality of the circumstances." *In re B.W.,* 2017-Ohio-9220, 103 N.E.3d 266, ¶ 20 (7th Dist.). After all, probable cause

is "incapable of precise definition" and is a "fluid concept—turning on the assessment of probabilities in particular factual contexts." *Maryland v. Pringle*, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), quoting *Illinois v. Gates*, 462 U.S. 213, 232, 76 L.Ed.2d 527, 103 S.Ct. 2317 (1983). At bottom, " 'probable cause is a reasonable ground for belief of guilt,' * * * and that the belief of guilt must be particularized with respect to the person to be searched or seized." *Pringle* at 371, quoting *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).

{¶28} To establish probable cause to believe that R.Z. committed burglary under R.C. 2911.12(A)(1), the evidence must have demonstrated that R.Z. used "force, stealth, or deception" to "trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with the purpose to commit" a criminal offense in the structure. The only disputed issue is whether the identification evidence established probable cause to believe that R.Z. committed the alleged acts.

{¶29} The state contends that the evidence submitted, particularly the lab report and the BCI notification, were credible and sufficient identification evidence linking R.Z. to the alleged crime. The state maintains that the DNA evidence from the knife proved that R.Z. was in the house, and "Johnson did not know R.Z., so that his DNA was there for an innocuous reason was eliminated as a possibility." In response, R.Z. maintains that the state failed to confirm the preliminary association of R.Z. to the biological evidence collected from the kitchen knife and the evidence fails to demonstrate that R.Z. was present in the house to commit a criminal offense. We agree with R.Z. and hold, based on the facts established at the bindover hearing, that the ambiguous language in the BCI notification was insufficient to establish probable cause to believe that R.Z. perpetrated the offense.

{¶30} First, consider the restrained language of the BCI notification. The notification was merely an "investigative lead." The notification described the connection between R.Z. and the biological evidence recovered from the house as a "preliminary association." The notification continued and explained that **"[a]ny possible connection or involvement** of the individual to the case must be determined through further investigation." (Emphasis added.) Still more, the notification stressed that an additional sample from R.Z. "must be obtained for verification by the forensic laboratory."

{¶31} The notification made it clear that "**any possible** connection or involvement" of R.Z. to the case "must be determined through further investigation." "Any possible connection" is broad. It encompasses probable-cause hearings as well as verdicts. And Blackwell testified that his investigation of this connection between R.Z. and the offense consisted of phone calls to R.Z. and his attorney. There was no testimony that these telephone calls clarified the connection between R.Z. and the crime. Further, Blackwell testified that the preliminary association between R.Z. and the biological evidence recovered from the house "has yet to be verified." This was simply an investigative lead that did not establish probable cause. And not every investigative lead will establish probable cause. *See State v. Demaria*, 11th Dist. Geauga No. 699, 1977 Ohio App. LEXIS 8360, *4 (June 20, 1977).

{¶32} Second, the record contains no explanation of what the phrase "preliminary association" means. And the state failed to present any evidence that defined "preliminary association." To illustrate the significance of this omission, in a recent case a BCI "report showed that the DNA of the unknown male in the vaginal sample was consistent with [the defendant's] DNA, with a statistic ratio of being rarer

14

than one in one trillion unrelated individuals." *State v. Williams*, 2d Dist. Clark No. 2021-CA-66, 2022-Ohio-2517, ¶ 23. The report in *Williams* explained the meaning of that statistic—"the forensic scientist would have to test more than a trillion other persons who were not [the defendant]'s identical twin to find someone also matching that DNA profile." *Id.* But here, there was no such explanation. The only evidence in the record that approaches an explanation is Blackwell's testimony that he had "enough probable cause from the DNA sample returned from the Coroner's office." But this is nothing more than a conclusion drawn by Blackwell—it explains nothing. We recognize that an "officer may draw inferences based on his own experience." *Ornelas v. United States*, 517 U.S. 690, 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) ("Deputy Luedke, who over the past nine years had searched approximately 2,000 cars for narcotics, * * * testif[ied] that a screw in the doorjam adjacent to the loose panel was rusty, which to him meant that the screw had been removed at sometime."). But unlike in *Ornelas*, there is nothing in the record to which we can defer that demonstrates Blackwell's experience or training involving DNA test results. And significantly, the preliminary association was never verified through further testing. Without more, a "preliminary association"—a term that is both equivocal and ambiguous—fails to establish anything more than mere suspicion that R.Z. was involved. The facts and circumstances established by the state's evidence in this case left the juvenile court to speculate the meaning of preliminary association.

{¶33} With DNA, context matters. For decades, the federal government has warned that "to say that two [DNA profiles] match, without providing any scientifically valid estimate (or, at least, an upper bound) of the frequency with which such matches might occur by chance, is meaningless." National Research Council, DNA Technology

15

in Forensic Science 74 (1992). Likewise, courts from around the nation insist on a quantitative estimation to contextualize the meaning of DNA testing results. *See Brim v. State,* 695 So.2d 268, 269-270 (Fla.1997) ("Certainly, a judge's or juror's untutored impression of how unusual a DNA profile is could be very wrong."); *see also State v. VandeBogart,* 136 N.H. 365, 381-382, 616 A.2d 483 (1992); *Commonwealth v. Mattei,* 455 Mass. 840, 853, 920 N.E.2d 845 (2010) ("Without reliable accompanying evidence as to the likelihood that the test could not exclude other individuals in a given population, the jury have no way of evaluating the meaning of the result."); *Duncan v. Commonwealth,* 322 S.W.3d 81, 92 (Ky.2010) ("[M]issing from the Commonwealth's proof was any testimony establishing the significance of that partial match"); *People v. Pike*, 2016 Il App (1st) 122626, 403 Ill.Dec. 93, 53 N.E.3d 147, 165 (Ill.App.2016) ("A statistic is necessary to understand the significance of the inclusion as a potential contributor."); *State v. Phillips,* 430 S.C. 319, 335, 844 S.E.2d 651 (2020) ("the State made almost no effort to educate the trial court on the factual and scientific basis of Gallman's opinions"); *State v. Terrance Police*, 343 Conn. 274, 306, 273 A.3d 211 (2022) ("[T]o satisfy the particularity requirement of the fourth amendment, the affidavit accompanying a John Doe DNA arrest warrant application must contain information assuring the judicial authority issuing the warrant that the DNA profile identifies the person responsible for the crime on the basis of his or her unique DNA profile and should include information as to the statistical rarity of that DNA profile."). While these cases address issues not relevant in this case, they demonstrate a widespread acceptance of the need to contextualize DNA testing results to avoid relying on inferences and speculation.

16

**{¶34}** An Ohio court has held that an investigating officer's testimony and sworn statement that a defendant's DNA was found on a sexual-assault survivor based on a BCI notification, which indicated that a "preliminary association" existed between the defendant and profiles recovered from a rape kit, was not demonstrably false and provided probable cause to arrest the defendant. *See State v. Goins,* 10th Dist. Franklin No. 14AP-747, 2015-Ohio-3121, ¶ 21-22. The trial court in *Goins* noted that the lack of a full investigation did not diminish the evidentiary value, "particularly in the context of this specific crime." *Id.* at ¶ 18. In *Goins*, the state presented testimony from two BCI witnesses and from the investigating officer, who testified "that he sought the arrest warrant for appellant based on the June 7, 2013 BCI notification stating that appellant's DNA was found in C.G.'s vaginal area." *Id.* at ¶ 18, 21-22. But here, BCI witnesses did not provide any testimony. And Blackwell, the only state's witness at the bindover hearing, provided no context or explanation about what the "preliminary association" meant. And in this case the biological evidence recovered from the knife contained "a mixture of DNA from at least three individuals" in contrast to the simple-source mixture in *Goins. Id.* at ¶ 6. Thus, it makes sense that the BCI notification warned that "[a]ny possible connection or involvement of the individual to the case must be determined through further investigation."

**{¶35}** Contrary to the dissent's argument, we are not asking for proof beyond a reasonable doubt. Rather, there must be something in the record to discern the meaning of highly technical evidence presented by the state to demonstrate the existence of probable cause. Here, the juvenile court was afforded nothing to extrapolate the significance of the notification or contextualize "preliminary association." Blackwell recited the language of the BCI report stated and testified a "hit

came back," which he later explained was a "preliminary hit." Neither Blackwell's testimony, nor the notification, established that the association—or hit—was anything more than preliminary in nature. The BCI notification failed to identify which profile from the three-individual mixture was preliminarily associated with R.Z. The state provided no accompanying statistical weight or explanation of a preliminary association, leaving the court to hypothesize the meaning of the BCI notification. *See, e.g., Ornelas*, 517 U.S. at 700, 116 S.Ct. 1657, 134 L.Ed.2d 911 ("to Officer Luedke, who had searched roughly 2,000 cars for narcotics, [a loose panel and rusty screw] suggested that drugs may be secreted inside the panel"); *see also Williams*, 2d Dist. Clark No. 2021-CA-66, 2022-Ohio-2517, at ¶ 23 ("This report showed that the DNA of the unknown male in the vaginal sample was consistent with Williams's DNA, with a statistic ratio of being rarer than one in one trillion unrelated individuals."). So, while the notification instructed that "**[a]ny possible** connection or involvement of the individual to the case **must be determined** through further investigation," the state failed to present evidence that a further investigation linked "any possible" involvement of R.Z. to the offense.

{¶36} Nothing in this opinion diminishes the probative value of DNA test results. Nor do we question the reliability of CODIS or SDIS. We simply conclude that courts, untrained in forensic sciences, should not be left to divine the meaning from the words "preliminary association."

{¶37} Nor do we believe that this opinion will frustrate the state's ability to investigate crimes through DNA testing or impede the state's ability to secure a search warrant for further DNA testing. We recognize that probable cause for searches and seizures "are measured by similar objective standards" which demands "the *same*

*quantum of evidence.*" (Emphasis added.) *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir.1996), quoting 1 Wayne R. LaFave, *Search and Seizure: A treatise on the Fourth Amendment*, Section 3.1(b), 544 (1996). But this "standard applies differently in different contexts" with distinct inquiries for courts and law enforcement. *United States v. Baker*, 976 F.3d 636, 645 (6th Cir.2020). For a search, the inquiry focuses on whether "there is a fair probability that evidence of a crime will be found" on the person specified. *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 35; *see State v. Johnson*, 7th Dist. Mahoning No. 17 MA 0099, 2018-Ohio-2780, ¶ 15. In contrast, probable cause in a bindover hearing, like probable cause to arrest, asks whether the "facts and circumstances [are] sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." (Internal citations omitted.) *State v. Jordan*, 166 Ohio St.3d 339, 2021-Ohio-3922, 185 N.E.3d 1051, ¶ 19; *see Iacona,* 93 Ohio St.3d at 93, 752 N.E.2d 937.

{¶38} This distinction is critical because " 'there may be probable cause to search without probable cause to arrest, and vice-versa.' " *Greene* at 1106, quoting *LaFave* at 546. Thus, while the facts of this case compel us to hold that the state failed to establish probable cause at the bindover hearing, our holding does not affect the state's ability to investigate crimes through DNA testing or secure a search warrant for further testing.

### III. Conclusion

{¶39} We hold that the juvenile court had jurisdiction over R.Z. because he was a child under R.C. 2152.02 when he was apprehended before his 21st birthday for conduct that occurred before his 18th birthday. The state exercised its statutory right of appeal under R.C. 2945.67(A). And the juvenile court's order was a final, appealable

order under R.C. 2505.02. Finally, we overrule the state's single assignment of error and affirm the juvenile court's judgment.

Judgment affirmed.

**BERGERON, J.,** concurs.

**MYERS, P.J.,** concurs in part and dissents in part.

**MYERS, P.J.,** concurring in part and dissenting in part.

{¶40} I agree with the majority's holding that this court has jurisdiction to hear this case. But because I would hold that the trial court erred in determining that there was not probable cause to believe that R.Z. committed the offense, I dissent.

{¶41} The test for establishing probable cause in a bindover is the same test to establish probable cause to arrest, that is, whether the facts and circumstances were sufficient to warrant a prudent person in believing that the defendant committed an offense. *See State v. Billings*, 1st Dist. Hamilton Nos. C-200245 and C-200246, 2021-Ohio-2194, ¶ 19; *State v. Iacona*, 93 Ohio St.3d 83, 93, 752 N.E.2d 937 (2001). As the majority correctly recognizes, the test for probable cause is something short of beyond a reasonable doubt, but more than a mere suspicion. *Iacona* at 93; *State v. Smith*, Slip Opinion No. 2022-Ohio-274, ¶ 39. In other words, there must be facts that elevate R.Z. as the possible perpetrator of the offense beyond mere suspicion into the realm of more probable than not. And it is important to remember that "[p]robable cause is a lesser standard of proof than that required for a conviction, such as proof beyond a reasonable doubt or by a preponderance of the evidence." *State v. Norman*, 4th Dist. Ross Nos. 08CA3059 and 08CA3066, 2009-Ohio-5458, ¶ 26. A prima facie showing of criminal activity is not necessary to establish probable cause; rather, probable cause

requires instead "a showing that a probability of criminal activity exists." *Id.*, quoting *State v. Young*, 146 Ohio App.3d 245, 254, 765 N.E.2d 938 (11th Dist. 2001).

**{¶42}** What do we have here? At the time the offense was committed, DNA was recovered from various items in the victim's home, including a knife that belonged to the victim. The recovered DNA was entered into a data base. Years later, after R.Z. was arrested on another charge, his DNA was entered into the CODIS system, and a hit came back linking R.Z.'s DNA to the DNA recovered from the victim's knife. Detective Blackwell testified that a hit came back linking the DNA on the knife to R.Z. and that a preliminary association was made between the tested DNA on the knife and R.Z. We also have the testimony of the victim that she did not know R.Z. and that there was no reason for him to have been in her home.

**{¶43}** In my opinion, this was sufficient to establish probable cause that R.Z. had committed the offense. Such a determination is supported by *State v. Goins*, which, as recognized by the majority, found that a BCI notification indicating that a "preliminary association" existed between the defendant and profiles recovered from a rape kit provided probable cause to arrest the defendant. *Goins*, 10th Dist. Franklin No. 14AP-747, 2015-Ohio-3121, at ¶ 22. The majority attempts to distinguish *Goins* from the case before us based on a finding that the DNA in *Goins* concerned a simple-source mixture, whereas the biological evidence recovered from the knife in this case contained "a mixture of DNA from at least three individuals." *See* majority opinion at ¶ 34. However, a case summary sheet accompanying the complaint filed by Detective Blackwell indicated that:

> On February 10, 2016 the Hamilton County Crime Laboratory released
> an 'official crime laboratory report' stating that a DNA profile was

21

identified from the swabs of the kitchen knife from at least three individuals. From this mixture a major and minor DNA profiles [sic] were identified. The major DNA profile originaled [sic] from a male individual and the minor had limited value for comparions [sic] purposes. The major DNA profile obatained [sic] from the swab was entered into the local (CODIS) Combined DNA index system.

On 1/13/2021 The Hamilton County Coroner's Laboratory Bureau of Criminal Investigation released a report stating the (SDIS) Ohio State DNA index system, association was made between the Coroner's Laboratory specimen and [R.Z.].

{¶44} So it is clear that the DNA obtained from the knife that had a preliminary association to R.Z. was the major DNA profile found on the knife. As the case summary makes clear, the minor DNA profile obtained from the knife had limited value for the purpose of DNA comparison and was not entered into the CODIS database. I therefore find the majority's attempt to distinguish *Goins* unpersuasive, and would hold that in this case, like *Goins*, evidence that a preliminary association was made between the tested DNA on the knife and R.Z. was sufficient to establish probable cause.

{¶45} The majority argues that because the BCI notice used the words "preliminary association" to describe the match between R.Z.'s DNA entered into the system and the DNA found on the knife, and because there was not a further sample taken from R.Z. to confirm his DNA, the evidence was insufficient to rise to the level of probable cause. I strongly disagree, and question that if a DNA hit does not provide probable cause, then what does? First, even if there was only a preliminary association

22

between R.Z.'s DNA and the sample taken from the knife, this is sufficient to rise above mere suspicion. R.Z. was physically linked to the knife. In addition, as the majority stresses, the notice does say that any possible connection or involvement of R.Z. to the case needed to be determined through further investigation. And that is certainly true. A DNA hit by itself does not tell anything about the crime, including who committed it. It tells us only that the DNA found on the knife has been preliminarily identified as the DNA of R.Z. In other words, the police must take further steps to investigate the crime and ultimately establish whether R.Z. committed the offense. For example, there may be other explanations as to why his DNA was at the scene, all of which are unknown to BCI. Perhaps R.Z. was a friend of the victim. Perhaps the knife belonged to someone who brought it to the victim's home (and R.Z.'s DNA was present for an innocent reason). Perhaps there was transfer DNA. The language in the BCI notice was simply intended to convey that there must be further investigation to connect R.Z. to the particular case being investigated. It says further investigation is necessary to tie him to the case, not to tie him to the DNA. The language does not suggest that probable cause is lacking in the absence of such further investigation. And here, much of that investigation had already been done.

{¶46} The fact that further investigation is necessary is not unique to this case. Take for example a case involving an unknown rapist. Under this hypothetical, assume that a rape was committed, and a DNA sample was obtained from the victim's body and entered into CODIS. Several years later, a suspect is arrested on an unrelated crime and that suspect's DNA is taken and also entered into CODIS. A hit comes back identifying a preliminary association between the suspect's DNA and the DNA obtained from the rape victim. I would find that this preliminary association is

23

sufficient to establish probable cause to obtain both an arrest warrant for the underlying crime of rape and a search warrant to obtain a DNA swab from the suspect. But further investigation is necessary to establish that the suspect committed the rape. Perhaps that investigation would establish that the suspect and the victim had engaged in consensual sex. Regardless of whether further investigation is necessary to establish a suspect's involvement in the case, probable cause still existed. As in this case, probable cause to arrest is not lacking in the absence of further investigation. *See Goins,* 10th Dist. Franklin No. 14AP-747, 2015-Ohio-3121.

{**¶47**} The majority also relies on the statement in the BCI notice that an additional sample must be obtained to confirm that R.Z. is the person whose DNA was entered into the system. In other words, the lab needs to verify R.Z. from a known sample from him, and not rely solely on the name entered into the system. Again, ultimately verifying that the R.Z. whose DNA is in the system is the R.Z. whose DNA is on the knife would be required to prove identity beyond a reasonable doubt. But I would find that such verification is not necessary to establish probable cause. We are out of the realm of suspicion and into the realm of probability.

{**¶48**} Finally, the detective testified there was a preliminary association between the tested DNA on the knife and R.Z. This testimony from an experienced officer constituted evidence that elevated R.Z. as the possible perpetrator of the offense beyond mere suspicion into the realm of more probable than not. *See Norman*, 4th Dist. Ross Nos. 08CA3059 and 08CA3066, 2009-Ohio-5458, at ¶ 29-30 (where a DNA profile was established from evidence collected at the crime scene and was entered into the CODIS database and a hit was received linking that profile to

defendant, there was probable cause to obtain an oral swab from defendant to confirm the DNA match).

**{¶49}** The majority seems to suggest that to rise to the level of probable cause, either the BCI notice had to "identify which profile from the three-individual mixture was preliminarily associated with R.Z.," or the state had to provide "statistical weight or explanation of a preliminary association" so that the trial court did not have to "hypothesize the meaning of the BCI notification." As to the first, the initial charging document from Detective Blackwell makes clear that only the major DNA profile was entered into CODIS. Thus, the profile from the mixture was identified as being associated with R.Z.; it was the only profile entered. As to the second, I reject this proposition. First, the BCI notice is not a lab report. It is a notification that DNA entered into the CODIS system matched DNA previously entered into that same system. BCI is not the laboratory that analyzed the DNA on the knife, and it did not independently evaluate the DNA. It simply reported a match in its system. *See State v. Williams*, 6th Dist. Lucas No. L-12-1238, 2015-Ohio-405, ¶ 110 ("A DNA sample is not the same as a DNA profile, as a DNA sample is processed by a specialist in order to obtain the DNA profile."). At trial, presumably, the lab would do a report and provide expert testimony. In an ideal world, would it have been nice to have all this information before a probable-cause hearing? Of course it would. But that does not mean the evidence presented was insufficient to establish probable cause.

**{¶50}** Second, the majority relies on criticisms of DNA evidence. While these criticisms may be the subject of expert testimony or cross-examination at trial, they do not affect a determination as to whether probable cause existed. And, the cases relied upon by the majority speak to proof at trial, not initial probable cause. As the

25

Supreme Court of Ohio has made clear, the inquiry is not one of proof beyond a reasonable doubt. *See Iacona*, 93 Ohio St.3d at 93, 752 N.E.2d 937; *Smith*, Slip Opinion No. 2022-Ohio-274, at ¶ 39.

**{¶51}** Under the majority's reasoning, because the BCI notification is insufficient to establish probable cause, law enforcement could not get a warrant to get a swab from R.Z. in order to confirm that the DNA was a match. They would have no probable cause to support the warrant. To the contrary, I would find that there would be probable cause to obtain a warrant for a DNA swab under these facts. *See Williams* at ¶ 112 (BCI notification of a CODIS match identifying defendant as a major contributor and explaining that further testing was required provided probable cause to obtain a sample of defendant's DNA). In fact, Detective Blackwell testified that he had already obtained a search warrant, "ready to go and signed by the judge," to get a DNA sample from R.Z, but that he had not yet made contact with R.Z. to execute it. So, in this case, an independent magistrate already determined that probable cause existed from the CODIS hit to allow a swab from R.Z. As I understand the majority's position, had this warrant been executed and R.Z.'s DNA confirmed, this would have constituted probable cause for the bindover. I would argue that this step is not required to establish probable cause. Going back to my rape example, I believe that once a DNA hit is made, probable cause exists to believe the suspect committed the rape.

**{¶52}** The majority argues that its holding will not impact the state's ability in future cases to secure a search warrant for DNA testing because the probable-cause standard is applied differently in different contexts, and that probable cause to obtain a search warrant focuses on whether a fair probability exists that evidence of a crime

will be found, whereas probable cause to bind over a juvenile focuses on whether a prudent person would believe that the juvenile had committed, or was committing, an offense. I hope the majority is correct in its analysis of the application of the probable-cause standard in different contexts, but I fear it is not.

{¶53}   In fact, *Greene v. Reeves*, 80 F.3d 1101, 1106 (6th Cir.1996), relied upon by the majority in support of its argument, gives credence to my concern that under the majority's reasoning, law enforcement would not be able to obtain a search warrant to swab R.Z.'s DNA. In *Greene*, a case that focused on whether defendants were entitled to qualified immunity, the court discussed the difference between probable cause to arrest and probable cause to search, stating that:

> While the focus of the two tests is of course different—whether the person has committed a crime or whether evidence of a crime will be found—the prudent person standard is the same. Professor LaFave notes that "it is generally assumed by the Supreme Court and the lower courts that the *same quantum of evidence* is required whether one is concerned with probable cause to arrest or probable cause to search." 1 LaFave, *supra*, § 3.1(b), at 544 (emphasis added). LaFave recognizes that the focus of the arrest inquiry is different from that of the search inquiry and acknowledges that "there may be probable cause to search without probable cause to arrest, and vice-versa." *Id.* at 546. Here, both findings must ultimately stand or fall on the same evidence. If it was reasonable to obtain a search warrant, it had to be equally reasonable to obtain the arrest warrant.

*Id.* at 1106.

**{¶54}** In this case, like *Greene*, both findings of probable cause to arrest and probable cause to obtain a search warrant for a DNA swab "must ultimately stand or fall on the same evidence." *See id*. This is particularly true in most cases involving DNA evidence. And because Detective Blackwell was able to obtain a search warrant to swab R.Z.'s DNA, which he obtained after establishing probable cause, there necessarily also existed probable cause to believe that R.Z. committed the burglary charged in this case. In other words, the DNA hit established both that evidence of the crime was likely to be found on R.Z.'s person and that he likely committed the burglary. In this case, any distinction between the two probable causes is a distinction without a difference.

**{¶55}** In this case, like countless other DNA "hit" cases, the probable cause to believe that R.Z. committed the burglary is based on exactly the same facts and evidence as the probable cause to believe the DNA found on his person will be a match to the DNA on the knife. If, as the majority suggests, there is not sufficient probable cause to believe R.Z. committed the crime based on the DNA hit, then there is not probable cause to believe evidence will be found in his swab.

**{¶56}** Because I believe the evidence presented, particularly the DNA hit in CODIS coupled with the testimony from the victim that there was no reason for R.Z. to have been in her home handling her knife, established probable cause, I would reverse the trial court's judgment.